## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No. 09-23683-CIV-ALTONAGA

*In re*

**FONTAINEBLEAU LAS VEGAS
HOLDINGS, LLC**, *et al.*,

     Debtors.

**DESERT FIRE PROTECTION**, *et al.*,

     Appellants,

vs.

**FONTAINEBLEAU LAS VEGAS
HOLDINGS, LLC**, *et al.*,

     Appellees.

### <u>ORDER</u>

**THIS CAUSE** came before the Court on the consolidated appeals of the Contractor

Claimants, the Lien Claimants, and the M&M Lienholders (collectively, the "Statutory

Lienholders") of eleven orders of the U.S. Bankruptcy Court for the Southern District of Florida,

as well as the Motion to Dismiss of the Term Lender Steering Group [ECF No. 79].[1]  The Court

has considered the parties' written submissions,[2] the oral arguments presented on March 11,

2010, and the applicable law.

---

[1]  To conform with the new edition of *The Bluebook*, the Court designates all document numbers herein as "ECF No." *See* THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R. B7.1.4, at 21 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010).  All document numbers refer to 09-cv-23683-CMA only, not 09-cv-22828-ASG (the prior appeal) or 09-21481-AJC (the bankruptcy proceeding).

[2]  The Court expresses its gratitude to the parties and their attorneys for their initial and supplemental briefing, all of which was excellent.

Case No. 09-23683-CIV-ALTONAGA

## I.  BACKGROUND

Before June 2009 six Fontainebleau Las Vegas entities (collectively, "the Debtors")[3] were building Fontainebleau Las Vegas (the "Project") on the north end of the Las Vegas Strip.  The 63-story glass skyscraper would feature, among other things, a casino, 3,815 "stylishly furnished" guest rooms, a convention center, a theater for live entertainment and shows, and, not to be forgotten, "a 60,000 square-foot state-of-the-art spa."  (Decl. Howard C. Karawan ¶ 7).  Once expected to create 8,000 jobs in Las Vegas, the "signature 'Tier A' casino hotel resort" was "destined as the launching pad for a global chain of casinos bearing the name of the original Fontainebleau in Miami Beach."[4]

Before Fontainebleau Las Vegas could serve as any launching pad, however, the Project would need to be launched itself.  But by late 2008 that seemed far from certain.  One of the Project's chief lenders, Lehman Brothers, filed for bankruptcy, marking "a cataclysmic global decline in the credit markets."  (Decl. Karawan ¶ 24).  Other lenders failed to meet their funding commitments as well.  (*See id.* ¶¶ 25–27).  Unable to secure new funds, the Debtors were forced to halt construction when the Project was only 70 percent complete.  (*See id.* ¶ 7).  Left with no alternatives, on June 9, 2009 the Resort Debtors filed voluntary petitions for relief under Chapter

---

[3]  Fontainebleau Las Vegas Holdings, LLC; Fontainebleau Las Vegas, LLC; and Fontainebleau Las Vegas Capital Corp. are collectively referred to as the "Resort Debtors."  Fontainebleau Las Vegas Retail Parent, LLC; Fontainebleau Las Vegas Retail Mezzanine, LLC; and Fontainebleau Las Vegas Retail, LLC are collectively referred to as the "Retail Debtors."

[4]  Douglas Hanks, *Carl Icahn Gets Approval To Buy Fontainebleau Las Vegas*, MIAMI HERALD, Jan. 27, 2010, http://www.miamiherald.com/2010/01/27/1448967/carl-icahn-gets-approval-to-ok.html.

2

Case No. 09-23683-CIV-ALTONAGA

11 of the Bankruptcy Code.[5]

A group of prepetition lenders called the Term Lenders[6] had financed much of the Project in accordance with a June 2007 credit agreement, which was secured by a first lien on substantially all the Debtors' assets. (*See* Mot. 6). The Term Lenders had advanced more than $1 billion in all to the Debtors. (*See id.*). When the Debtors filed for bankruptcy in June 2009, $190 million remained in the Debtors' accounts, subject only to the Term Lenders' valid, perfected, and first-priority liens. (*See id.*). No entity other than the Term Lenders has claimed an interest in this "cash collateral."[7]

For the next six months the Debtors used this cash collateral — about $18 million in all — to pay their expenses. (*See id.* 7). The bankruptcy court authorized the Debtors to do so through twelve separate orders (the "cash-collateral orders"). Of those, five[8] have been appealed from as unlawful under the Bankruptcy Code (the "disputed cash-collateral orders"). Because these appeals concern in large part the propriety of these orders, the Court begins the discussion with a review of the circumstances surrounding their entry.

---

[5] The Retail Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on November 25, 2009. *See infra* Part I.B.

[6] Aurelius Capital Management, LP ("Aurelius"), who later intervened in these appeals, "is the single largest holder of Term Loans." (Jan. 19, 2010, Order 1 [ECF No. 55]). Although Aurelius is not technically a member of the "Term Lenders," these parties' interests in these appeals are generally aligned.

[7] As its name suggests, cash collateral is "[c]ollateral consisting of cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents." BLACK'S LAW DICTIONARY 278 (8th ed. 2004) (citing 11 U.S.C. § 363(a)).

[8] The third cash-collateral order was amended on August 7, 2009, and that order was also appealed from. That is why there are six orders dismissing the appeals as untimely, as opposed to five. (*See* Dec. 29, 2010, Order 1 [ECF No. 25]); *see also infra* Part I.C.

3

Case No. 09-23683-CIV-ALTONAGA

**A.      From a Reorganization . . .**

The bankruptcy court entered the first and second cash-collateral orders without objection from the parties and with the consent of the Term Lenders.[9]  These and the other cash-collateral orders granted the Term Lenders adequate protection of their interest in the cash collateral "for and equal in amount to the amount of Cash Collateral used . . . , and the aggregate diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral."  (*E.g.*, Third Cash-Collateral Order ¶ 6).  The orders accomplished this by granting replacement liens (the "adequate-protection liens") on the Debtors' collateral, including all "prepetition and postpetition assets."  (*E.g.*, *id.* ¶ 6(a)).  The orders also prohibited the adequate-protection liens from being "subordinated to or made *pari passu*[10] with any other Lien, whether under 364(d) of the Bankruptcy Code or otherwise."  (*E.g.*, *id.* ¶ 11(e)).  And before any liens senior to the Term Lenders' adequate-protection liens could be granted, the orders required the "indefeasible payment in full in cash" of the obligations of the Debtors to provide adequate protection.  (*E.g.*, *id.*).  Last, the orders provided that any later modification, amendment, or vacatur could not affect any previously granted liens the bankruptcy court had granted to the Term Lenders.  (*E.g.*, ¶ 16).  These provisions exist in substantially the same form in each of the cash-collateral orders, and they are central to the Term Lenders' Motion to Dismiss.

---

[9] Under 11 U.S.C. § 363(c)(2), a debtor in possession "may not use . . . cash collateral . . . unless — (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section."  A bankruptcy court must "prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  *Id.* § 363(e).

[10] "Proportionally; at an equal pace; without preference < creditors of a bankrupt estate will receive distributions *pari passu* >."  BLACK'S, *supra*, at 1147.

4

Case No. 09-23683-CIV-ALTONAGA

The Appellants, whom the Court will call the Statutory Lienholders, are "the folks that built th[e] building." (Hr'g Tr. 8:8–9, Mar. 11, 2010 [ECF No. 100]). The Statutory Lienholders, who have filed about $615 million in mechanics' liens against the Project, disagree that the Term Lenders hold first-priority liens on the Project. (*See* Br. Appellants 15 [ECF No. 56]). They contend that because they began work on the Project before the Term Lenders secured a lien on the Debtors' assets under the June 2007 credit agreement, their liens, and not the Term Lenders', are first in priority under Nevada law, which is "unique" and is "heavily favored in the side of the contractors and materialmen." (Hr'g Tr. 8:16–17, Mar. 11, 2010; *see also* Br. Appellants 16–17 (citing NEV. REV. STAT. § 108.225)). The Statutory Lienholders' assertion that their liens are first in priority, which the Term Lenders "vigorously contest" (*see* Mot. 9), has been made known since the Debtors filed for bankruptcy (*see* Decl. Karawan ¶ 27), and will be decided in one or more adversary proceedings in the bankruptcy court.[11] This issue of priority — more specifically, the *fact* that it is an issue — is highly relevant to these appeals. But the ultimate issue of "Who's on first?," as the attorneys in this case have called it, is not before the Court. The Court expresses no opinion on the matter one way or the other.

It was during the build-up to the third cash-collateral order, which the bankruptcy court entered on July 31, 2009, that the issue of priority became relevant to these appeals. The Term

---

[11] *See Wilmington Trust FSB v. A1 Concrete Cutting & Demolition, LLC* (*In re Fontainebleau Las Vegas Holdings, LLC*), 09-02480-AJC (Bankr. S.D. Fla. filed Dec. 2, 2009); *Zetian Sys., Inc. v. Fontainebleau Las Vegas, LLC* (*In re Fontainebleau Las Vegas Holdings, LLC*), 09-02187-AJC (Bankr. S.D. Fla. filed Oct. 15, 2009); *Desert Fire Protection v. Fontainebleau Las Vegas, LLC* (*In re Fontainebleau Las Vegas Holdings, LLC*), 09-02179-AJC (Bankr. S.D. Fla. filed Oct. 14, 2009); *Turnberry W. Constr. v. Ave. Fund, Ltd.* (*In re Fontainebleau Las Vegas Holdings, LLC*), No. 09-01762-AJC (Bankr. S.D. Fla. filed July 14, 2009).

5

Lenders had become increasingly reluctant to consent to the Debtors' further use of the cash collateral.  The Debtors were not operating and generating cash as a run-of-the-mill debtor in possession might; the Debtors, rather, were "effectively a building that was three quarters of the way completed and nothing more."  (Hr'g Tr. 8:3–4, Mar. 11, 2010).  It appeared increasingly unlikely that the cash collateral would be replenished.  (*See* Hr'g Tr. 11:17–21, July 27, 2009).  Moreover, it was perceived to be unfair that the Debtors would use the cash collateral, to which the Term Lenders held an undisputed first-priority lien, for the benefit of all the creditors.  (*See id.*).  The Term Lenders, understandably, were not keen on the Debtors using the cash collateral to maintain assets to which the Statutory Lienholders asserted first-priority liens because of the possibility the Term Lenders' liens would later be found junior to those of the Statutory Lienholders.  This was especially so thanks to a May 2009 valuation of the Debtors' assets at $318.7 million: if the Statutory Lienholders were "on first," under this valuation the Term Lenders would take nothing.  (*See* Br. Appellants 18 & n.20).  In short, the Term Lenders were concerned about the Debtors' ability to protect the Term Lenders' interest in the cash collateral.

To that end, the Term Lenders "refused to consent to the further use of their cash collateral . . . unless [they] received *priming liens* with priority over Appellants that did not hinge on the outcome of the dispute over the priority of the prepetition liens."  (Mot. 9 (emphasis added)).  A "priming lien" is a lien granted senior or equal to an existing lien.  *See* 3 COLLIER ON BANKRUPTCY ¶ 364.01, at 364-3 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2010). The Debtors agreed and moved the bankruptcy court to authorize the grant of a priming lien in the amount of the decrease of the cash collateral they would use under the third cash-collateral

6

Case No. 09-23683-CIV-ALTONAGA

order.  After notice and a hearing, the bankruptcy court, under the heading, "Prepetition Debt and

Adequate Protection Obligations Deemed to Be Postpetition Debt Secured by Senior Lien Under

Section 364(d) of the Bankruptcy Code," found:

> While no creditor has asserted a lien in the Cash Collateral senior to the Prepetition Secured Parties, certain creditors have, subsequent to the Petition Date, asserted the existence of statutory liens with priority over the real property subject to the Prepetition Liens.  The Term Lender Steering Group is unwilling to consent to use of their Cash Collateral unless any Cash Collateral used since the Petition Date under this Order is *deemed to have been repaid* to the Prepetition Secured Parties in satisfaction of payment Obligations under the Prepetition Loan Documents and/or existing Adequate Protection Obligations, and further *deemed to have been reborrowed* by the Debtors as postpetition debt, pursuant to section 364(d) of the Bankruptcy Code, secured by the Adequate Protection Liens granted under this Order.  Based on the record before this Court, the provisions under this Order described herein are appropriate, necessary, and authorized by the Bankruptcy Code.

(Third Cash-Collateral Order ¶ G (emphasis added)).

For two principal reasons, the Statutory Lienholders objected to the entry of the third

cash-collateral order, calling it an "end-run around" their liens.  (Hr'g Tr. 11:14–15, Mar. 11,

2010).  First, despite the bankruptcy court's "finding," the Debtors never actually "repaid" the

cash collateral to the Term Lenders, and the Debtors never actually "reborrowed" it either.

Hence the word "deemed," which means "[t]o treat (something) as if (1) it were really something

else, or (2) it had qualities that it does not have."  BLACK'S, *supra*, at 446 (first definition).  This

"sham repayment and reborrowing transaction" (Hr'g Tr. 11:13, Mar. 11, 2010), the Statutory

Lienholders state, was the only way the Debtors could provide a priming lien to the Term

Lenders because 11 U.S.C. § 364(d) allows for priming liens only when a debtor seeks to obtain

*future* extensions of credit, *see Shapiro v. Saybrook Mfg. Co.* (*In re Saybrook Mfg. Co.*), 963

7

F.2d 1490, 1495 (11th Cir. 1992), and has nothing to do with the use of cash collateral.  Second, the Statutory Lienholders contend that even if section 364(d) permitted a debtor to provide a priming lien as adequate protection for the use of cash collateral, then the bankruptcy court failed to ensure that their liens were adequately protected.  *See* 11 U.S.C. § 364(d)(1)(B).[12]  Over the objections, the bankruptcy court nevertheless entered the third cash-collateral order, and later the fourth, which also gave a priming lien to the Term Lenders.

Yet even with the priming liens, which ensured that the Term Lenders would recover from the Debtors' assets before the Statutory Lienholders would, the Term Lenders were no longer willing to consent to the Debtors' use of the cash collateral because "the Debtors continued to churn through millions of dollars of cash collateral and ma[d]e no progress toward a reorganization."  (Term Lenders' Br. 9–10).[13]  So the Debtors, without the Term Lenders' consent, filed a motion seeking to use nearly $3 million in cash collateral (the Debtors also sought to grant a priming lien to the Term Lenders in the same amount).  On September 18, over the Term Lenders' and the Statutory Lienholders' objections (the Statutory Lienholders objected for the same reasons as they had done before), the bankruptcy court entered the "nonconsensual" cash-collateral order, which authorized the Debtors to use about $2 million in cash collateral, and to grant a priming lien to the Term Lenders in the same amount.[14]  (*See id.* 11).

---

[12]  In addition, the Statutory Lienholders contend the bankruptcy court never determined whether the Debtors were "unable to obtain such credit otherwise," as is required.  *See* 11 U.S.C. § 364(d)(1)(A).

[13]  No. 09-cv-22828-ASG.

[14]  On September 29 and September 30 the bankruptcy court entered the first supplemental order and the second supplemental order, respectively, which supplemented the nonconsensual cash-collateral order.

Case No. 09-23683-CIV-ALTONAGA

The Term Lenders appealed the nonconsensual cash-collateral order on an expedited basis to the U.S. District Court for the Southern District of Florida.  According to the Term Lenders, the order was final under 28 U.S.C. § 158(a)(1) because it "resolve[d] all issues relating to the . . . Debtors' alleged right to use [the] cash collateral . . . .  No further action by the Bankruptcy Court or any other party is required before those funds are fully and finally consumed, to the irreparable harm of the Term Lenders."  (*Id.* 1).  On the merits, the Term Lenders argued that

> the Bankruptcy Court authorized the Debtors to take and spend the Term Lenders' cash while "protecting" the Term Lenders' interests solely through a replacement lien on the incomplete Project — an asset that generates no cash and will cost more than $1 billion to complete, and on which the Term Lenders already have a lien.  That replacement lien does nothing other than cannibalize, dollar for dollar, the lien that the Term Lenders already have on the very same collateral.  Because the Debtors have conceded that the Term Lenders are undersecured, the replacement lien merely reduces the value of the Project available to satisfy the Term Lenders' preexisting liens against the Project.
>
> In the end, for every dollar the Debtors spend, the Term Lenders will have lost a portion of their cash collateral without changing the value of their liens against the Project.  This affords the Term Lenders' interest in the cash no protection whatsoever, much less the "adequate protection" required by the statute.

(*Id.* 12).  The Term Lenders also asserted that the bankruptcy court heard no evidence to make a finding that the Term Lenders' interest in the cash collateral was adequately protected.  (*See id.* 12–13).

The Statutory Lienholders appealed as well.  But unlike the Term Lenders, the Statutory Lienholders asserted that the order was interlocutory because, among other things, "the issue of lien priority [wa]s not resolved by any of the *interim* orders regarding cash collateral."  (J.

9

Case No. 09-23683-CIV-ALTONAGA

Opening Br. M&M Lienholders & Contractor Claimants 2).[15]   On the merits, the Statutory Lienholders argued section 364(d) did not authorize the grant of priming liens for the use of cash collateral, and that the Debtors did not provide the Statutory Lienholders with adequate protection.  (*See id.* 2–3).

On October 7 the Honorable Alan S. Gold, Judge of the U.S. District Court for the Southern District of Florida, affirmed the nonconsensual cash-collateral order and dismissed the appeals.  He concluded that the order was final with respect to the Term Lenders.  (*See* Hr'g Tr. 50:20–21, Oct. 7, 2009).  On the merits, Judge Gold expressed "significant concerns" that the Term Lenders' interest in the cash collateral was not being adequately protected.  Even so, because the Term Lenders had not moved for a stay, he concluded the "the cash collateral issues . . . [we]re moot to the extent of the amounts that already ha[d] been expended by the debtors." (*Id.* 55:5–7).  As to the Statutory Lienholders,

> the orders appealed from are interlocutory in nature as to them. . . .  Their concern and argument goes to the legality of the "superpriority liens" created by the last interim order, but I decline to exercise my interlocutory jurisdiction to decide the legality of the "superpriority liens" because the controlling question of law critical here has not been properly advanced, that deciding the issue raised at this juncture on this record is premature and in any event would not advance the ultimate termination of the litigation; that is to say, it would not avoid a trial on the complex issues of priority or otherwise shorten litigation.

(*Id.* 56:5–21).

**B.      . . . to a Sale**

By this point "any hope of an internal reorganization had truly evaporated."  (Hr'g Tr.

---

[15]  No. 09-cv-22828-ASG.

10

14:23–24, Mar. 11, 2010).  So the focus switched to a sale and, to that end, the Debtors had been negotiating with Penn National Gaming ("Penn") to sell the Debtors' assets under 11 U.S.C. § 363.  (*See* Mot. 12).  The hope was that Penn would be a stalking-horse bidder and provide debtor-in-possession ("DIP") financing to complete the Project and conclude the sale process. The DIP financing was to be on a "priming" basis under 11 U.S.C. § 364(d).  That is, to encourage Penn (or a different entity) to lend, the DIP financing would be senior in priority to other liens on the Project, including those asserted by the Term Lenders and the Statutory Lienholders.  (*See* Br. Examiner 5–6 [ECF No. 68]).

On September 25, because "[m]ore than $16 million of the Term Lenders' cash collateral ha[d] already been depleted, [and] no meaningful progress ha[d] been achieved by the Debtors and there [wa]s no reasonable likelihood of their rehabilitation," the Term Lenders moved to convert the Debtors' Chapter 11 cases to Chapter 7 and to appoint a trustee.  (Mot. Order Converting Debtors' Chapter 11 Bankruptcy Cases to Chapter 7 at 1).  Various creditors had been negotiating with Penn as well, and the "negotiations quickly became unwieldy."  (Br. Examiner 6).  According to one observer, Penn "felt like [the Debtors] had thrown them into a burning barn."  (Hr'g Tr. 18:16–17, Nov. 23, 2009).  The remaining value of the Project was threatened, and there was a danger a sale would not take place before the Debtors ran out of funds.  (*See* Br. Examiner 6).

In response, on October 1 the bankruptcy court *sua sponte* entered an order to show cause why it should not appoint an examiner:

> The Court believes it is more expeditious to proceed with any potential sale as
> soon as possible rather than to wait until October 28, 2009 when a Trustee, if

11

appointed, would be required to expend a significant amount of time to obtain counsel, familiarize himself or herself with this case and effectuate a sale.  It also appears more economical to immediately appoint an Examiner than to appoint a Trustee whose fees and expenses would likely far exceed the costs and expenses of an Examiner.  The Court therefore believes it is in the best interest of the estate and all parties to appoint an Examiner at this time to examine, negotiate and supervise a sale of the Debtors' assets pursuant to 11 U.S.C. § 363.  The opinion of the Term Lenders regarding the appointment of an Examiner should be given substantial weight as the Term Lenders are the holders of the largest secured claim(s) and have a lien on the cash collateral.

(Order To Show Cause 2).

At the show-cause hearing, the Term Lenders supported the appointment of an examiner and agreed to consent to the use of the cash collateral for his compensation.  (Hr'g Tr. 37:24–25, Oct. 8, 2009).  The Statutory Lienholders opposed it, or at least wanted the decision on any appointment delayed, to the extent the examiner's compensation would derive from the cash collateral, since "it comes out of the [Statutory] [L]ienholders ultimately . . . and every dollar . . . spen[t] on the[] cash collateral orders [the Statutory Lienholders] end up paying for it."  (*Id.* 38:3–7).  The Debtors, for their part, noted that a deal with Penn appeared to be imminent, and requested a delay of any appointment until after seeing whether a deal would be struck.[16]  At the end of the hearing, the bankruptcy court ordered the appointment of an examiner "in order to keep this matter moving."  (*Id.* 81:7–8).

On October 14, affording the Term Lenders' position "substantial weight (including their express willingness to allow the use of their cash collateral to pay the Examiner's fees and costs, and the costs of Examiner's professionals)," the bankruptcy court, under 11 U.S.C. § 1104(c),

---

[16]  The Debtors did note, however, that there would be benefits to the appointment of an examiner. (*See id.* 54:14–18).

ordered the U.S. Trustee to appoint an examiner to supervise the negotiation of the sale.  (Order

Appointing Examiner 2).  Furthermore:

> Arguments over whether the expenses of the Examiner shall be paid from cash collateral and given priming lien status or deducted from proceeds of the sale are unimportant.  The Examiner, Examiner's expenses and the expense of the Examiner's professionals shall be a first priority and either way will be superior to the disputed liens and mortgage claims on the Debtors' property.

(*Id.* 4).  The bankruptcy court cited no authority for this ruling.  In accordance with the

bankruptcy court's order, the Office of the U.S. Trustee appointed Jeffrey R. Truitt, whom the

bankruptcy court later approved as the Examiner.[17]

Then, on November 16, the Debtors filed the DIP financing motion and the sale motion.

(*See* Mot. 12).  The Debtors sought (1) third-party DIP financing from Penn under 11 U.S.C. §

364(d) (the "DIP facility"); (2) an asset-purchase agreement between the Debtors and Penn,

under which Penn agreed to pay a purchase price of $50 million plus any amounts advanced

under the DIP facility, which would serve as a stalking-horse bid for a sale process; and (3)

bidding procedures to govern the sale.  (*See id.*).  The DIP facility was to be used, among other

things, to "stabilize and secure" the Project for the upcoming winter season and to finance a

preauction-marketing process to solicit bids in excess of the price Penn was offering.  (*See id.*).

Penn, in turn, was insisting on a first-priority priming lien under 11 U.S.C. § 364(d), as well as

superpriority claims under 11 U.S.C. § 507(b).  And since that priming lien would, in turn,

---

[17] Meanwhile, the bankruptcy court entered a series of cash-collateral orders, to which the Statutory Lienholders did not object.  (*See* Hr'g Tr. 14:16–17, Mar. 11, 2010).  The reasons for this, the Statutory Lienholders state, were because these orders were for relatively small amounts, any further appeals on the use of cash collateral could scuttle the prospects of any sale, and the Statutory Lienholders had reserved their right to object to the previously granted priming liens.  (*See id.* 14:25–15:8).

"prime" the liens granted to the Term Lenders under the cash-collateral orders, paragraph 11(e) of each cash-collateral order, the Term Lenders state, required the Debtors to "indefeasibly repay" the cash collateral they had used in full and in cash. (*See id.*). To comply, the financing orders — the interim-resort-financing order, the interim-retail-financing order, the final-financing order — provided for the Debtors to repay the Term Lenders.

Before the bankruptcy court held a hearing on these motions, however, Icahn Nevada Gaming Acquisition LLC ("Icahn Nevada") appeared and offered to become the stalking-horse bidder on terms more favorable than those offered by Penn. At the hearing, which was held on November 23, Icahn Nevada emerged as the stalking horse. For the Project, Icahn Nevada would pay $105 million in cash on closing and provide a DIP facility of $51 million. (*See* Hr'g Tr. 117:6–11, Nov. 23, 2009).

The Statutory Lienholders objected to the motions, chiefly on the basis that the Debtors could not provide adequate protection for the value of the Statutory Lienholders' interest in the Project. While acknowledging the need to spend funds to stabilize the Project, they argued that the Debtors should not be able to use the borrowed funds on a priming basis to repay the cash collateral to the Term Lenders, pay the Debtors' professionals, and pay the Examiner (*see id.* 108:5–109:21). In specific regard to the Term Lenders' contention that the cash-collateral orders required the used cash collateral to be repaid before any priming liens could be granted to Icahn Nevada, counsel for the Statutory Lienholders stated:

> That doesn't say anything other than I've backed the Court and the debtor and the examiner into a corner and I'm going to enforce my rights. It's the exact same argument I've been making all day, except instead of relying on an order of this Court, I'm relying on what Congress told me, and Congress said you can't prime

me unless you give me adequate protection for which there has been no showing
or I consent.

(*Id.* 223:13–21).

Regarding these objections, the Examiner, consistent with the Term Lenders' contention,

testified that for the Debtors to secure DIP financing from Icahn Nevada on a priming basis — in

other words, the Debtors would grant to Icahn Nevada a lien superior to the liens granted to the

Term Lenders under the cash-collateral orders — the cash-collateral orders required the Debtors

to repay the cash collateral to the Term Lenders.  (*See id.* 189:18–191:25).  At the end of the

hearing, although finding the objections of the Statutory Lienholders persuasive, the bankruptcy

court, "based on the necessity of getting this thing moved along to a sale," approved the DIP

facility on the terms proposed by the Debtors.  (*Id.* 225:2–3).  As stated in the interim-resort-

financing order, entered on November 25,

> [t]he Debtors have an immediate need to obtain the DIP Credit Facility and the
> interim relief sought in the Motion.  The Debtors represent, the unrefuted
> testimony at the Interim Hearing confirms and the Court finds that without the
> financing proposed by the Motion, the Debtors will not have the funds necessary
> to pay post-petition payroll, payroll taxes, trade vendors, suppliers, overhead and
> other expenses necessary for the management and preservation of the Debtors'
> assets and properties in order to conduct the sale . . . .

(Interim-Resort-Financing Order ¶ E(I)).

In addition, the bankruptcy court found that the sale "clearly benefits" all creditors:

> [A]bsent the Sale, the Debtors will have no choice but to abandon their interests in
> the Project and their other assets subject of the Sale.  The testimony at the Interim
> Hearing also amply demonstrates that the expenses provided for in the Agreed
> Budget are the reasonable, necessary costs and expenses of preserving the value of
> the Debtors' assets or disposing of the Debtors' assets pursuant to the Sale.
> Absent such expenditures, the value of the property would be severely threatened
> and would decline significantly.  Even those costs and expenses which are not

> directly related to the Sale must be incurred by the Debtors to accomplish the Sale in chapter 11, which, under Section 363 of the Bankruptcy Code, can only be performed by the Debtors (in this case, under the supervision of the Examiner). This includes the repayment of the Used Cash Collateral which, pursuant to the prior Orders entered by the court, is required in order to obtain financing under the DIP Credit Facility. . . .  Moreover, in the face of the many bona fide disputes concerning the validity, priority and extent of liens and claims in respect of the Debtors' property, the alternative to the Sale portends protracted litigation during which such property shall go without protection, security or maintenance and be subjected to the risk of catastrophic damage and the accompanying decline in value.  Moreover, the ensuing loss of the Debtors' remaining employees will adversely affect continuing management and protection of the Debtors' property and the ability to provide information essential to the preservation of the property after the Debtors' abandonment of its [sic] interests therein.  In view of the foregoing, and based on the unrefuted testimony at the Interim Hearing, the Court finds and concludes that the interests of all entities holding liens in any property comprising the DIP Collateral . . . who have not otherwise consented to the DIP Motion are adequately protected as required by Section 364(d) of the [B]ankruptcy Code.

(*Id.* ¶ E(vi)).  In all, the bankruptcy court authorized $51,209,985 to be loaned to the Debtors.  Of the total amount, $17,974,410 was to be repaid to the Term Lenders under all the cash-collateral orders, of which $16,241,571 was derived from the disputed cash-collateral orders.  (*See* Br. Appellants 8).  Only $10,700,000 of the total amount was to be used to "stabilize" the Project. (*See* Br. Icahn Nevada 5 [ECF No. 84]).

Through this point in the proceedings it was only the Resort Debtors who had been in bankruptcy.  But on November 25 the Retail Debtors filed voluntary petitions for relief under Chapter 11 as well.  The Retail Debtors had been developing the "retail component" of the Project, where the restaurants, nightclubs, and stores would be located.  Described as the "hole in the donut" (Hr'g Tr. 43:7–8, Mar. 11, 2010), the retail component is intertwined in the overall Project, "like a bowl of spaghetti."  (Hr'g Tr. 105:24, Nov. 23, 2009).  The Retail Debtors'

16

primary asset was a 99-year leasehold interest from the Resort Debtors in the air space located above the podium section of the Project.  Part of the DIP facility, $602,000 worth, was earmarked to put the Retail Debtors into bankruptcy.  (*See* Hr'g Tr. 14:7–14, Dec. 2, 2009).  The idea was that a buyer would pay more for, and prefer, the Resort Debtors' assets and the Retail Debtors' assets together — the "whole enchilada" (Hr'g Tr. 62:21, Oct. 8, 2009) — than the Retail Debtors' assets alone.  In addition, Icahn Nevada required it.  (*See* Hr'g Tr. 12:19–20, Dec. 2, 2009).  To that end, the Retail Debtors moved the bankruptcy court to borrow $602,000 from the Resort Debtors, as contemplated, and to grant priming liens on and security interests in all property of the Retail Debtors' Chapter 11 estates to Icahn Nevada.  (*See* Br. Appellants 7).  This would secure the guarantee by the Retail Debtors of the obligations in the DIP facility, which the bankruptcy court had recently approved in the interim-resort-financing order.  In other words, the Resort Debtors would advance $602,000 to the Retail Debtors and, in return, the Retail Debtors would grant a priming lien to Icahn Nevada in the amount of $51,209,985.  (*See id.*).

A hearing on the motion was held on December 2.  At the hearing Howard Karawan, the chief-restructuring officer of the Retail Debtors, testified that the Retail Debtors' assets had "no value" "on an as-is basis."  (Hr'g Tr. 24:18–21, Dec. 2, 2009).  "[T]he only way to maximize value of the Retail assets," he explained, "is to make it part of a sale, because that's where the value is going to be unlocked as completion of the entire project, not just the Retail."  (*Id.* 25:7–10).  On cross-examination, Karawan made clear there was value to the Retail Debtors'

assets as part of a sale, assuming the sale would include the Resort Debtors' assets as well.[18]

After Karawan testified, the Statutory Lienholders objected to the motion on the ground that, as allegedly secured parties to the Retail Debtors' assets, the Debtors could not give them adequate protection in connection with the priming lien granted to Icahn Nevada under 11 U.S.C. § 364(d).  (*See id.* 67:1–70:21).   The bankruptcy court nevertheless granted the motion and entered the interim-retail-financing order on December 4, chiefly on the ground that such financing was necessary to preserve the Project.   In so doing, the bankruptcy court, citing Karawan's testimony, concluded that the leasehold of the Project had "zero value on a stand-alone basis."

> Thus, the value of the interests of the Prepetition Co-Lenders in the Leasehold Interests and other pre-petition collateral is zero and the Prepetition Co-Lenders are not entitled to adequate protection of such interests.  Having said that, the Sale clearly benefits all creditors claiming an interest in the property subject thereof and the inclusion of the Leasehold Interests in the Sale may enhance the value derived from the Sale.

(Interim-Retail-Financing Order ¶ E(vi)).

The bankruptcy court ultimately entered the final-financing order on December 16.  The financing orders together authorized Icahn Nevada to lend the Debtors $51,209,985 to pay administrative and operating expenses; pay stabilization costs; repay the Term Lenders the cash collateral that the Debtors had used; and pay the fees and expenses of professionals who brought the sale to a conclusion.  (*See* Br. Icahn Nevada 5–6).   Icahn Nevada received, among other things, a super-priority administrative claim under 11 U.S.C. § 364(c)(1), and, as stated, a first-

---

[18] "So, to be clear, the Retail assets have value, correct?  A.  Through a sale process.  Q.  Through a sale process, do the Retail assets have value?  A.  I believe they do."  (*Id.* 59:21–60:1).

Case No. 09-23683-CIV-ALTONAGA

priority priming lien and security interest in the property of the Debtors' estates.  (*See id.* 9).

Icahn Nevada, moreover, was found to have acted in good faith under 11 U.S.C. § 364(e).  (*See id.* 10).

On January 29, 2010, the bankruptcy court entered an order approving the sale, which closed on February 18.  As a result, the Debtors' rights, title, and interests in the assets have been transferred and vested in Icahn Nevada, and Icahn Nevada "credit bid"[19] the obligations of the DIP facility for the assets: the obligations are thereby released.  (*See id.* 6).  Owing to the closing, the priming liens granted to Icahn Nevada no longer exist.  (*See id.* 7).

## C.      The Consolidated Appeals

On December 4 the Statutory Lienholders appealed the interim-resort-financing order and the disputed cash-collateral orders (as well as the first and second cash-collateral orders).[20]  On December 8 the Statutory Lienholders appealed the interim-retail-financing order.  Earlier, on October 21 and 23, the Statutory Lienholders had appealed the examiner order.  Also on December 4 the Statutory Lienholders moved for a stay pending appeal of the interim-resort-financing order.  After a hearing on December 8, the bankruptcy court entered an order on December 14 stating it would stay the orders pending appeal if the Statutory Lienholders posted a bond by December 18 of approximately $160 million.  Citing the bleak state of the credit market

---

[19]  To "credit bid" is, at a sale, to offset one's "claim against the purchase price." COLLIER, *supra*, ¶ 363.06[10], at 363-52.

[20]  The Statutory Lienholders do not dispute the terms of the first and second cash-collateral orders. (*See* Br. Appellants 1 n.1).  Rather, they dispute the bankruptcy court's authorization of the repayment of the cash collateral used under these orders, because these orders did not grant the Term Lenders priming liens, but only replacement liens.  (*See id.*).  They contend it was error to satisfy the Term Lenders' replacement liens before satisfying the Statutory Lienholders' first-priority liens.  (*See id.* 13).

Case No. 09-23683-CIV-ALTONAGA

(*see* Hr'g Tr. 23:8–10, Mar. 11, 2010), the Statutory Lienholders contend they were unable to post the bond.  So the orders were not stayed, the disbursements were made, and the priming liens were granted to Icahn Nevada.

It took some time before the orders made their way to the undersigned.  As it must do under the Local Rules, the bankruptcy court dismissed the appeals of the cash-collateral orders as untimely since they failed to comply with the time limitations specified in Federal Rule of Bankruptcy Procedure 8002 (neither the appeals of the financing orders nor the appeal of the examiner order was dismissed).  *See* S.D. FLA. L.R. 87.4(b).  The Statutory Lienholders then, as the Local Rules permit, filed motions with the Court for review of the bankruptcy court's orders dismissing the appeals.  *See id.*  Apart from asserting that the bankruptcy court mistakenly dismissed the appeals as untimely (due to the cash-collateral orders' previously adjudicated interlocutory status), the Statutory Lienholders sought an order consolidating the appeals and setting an expedited-briefing schedule.

On December 29, after a status conference and on agreement by the parties, the Court reinstated the appeals of the cash-collateral orders "with all rights that would inure to the Parties, . . . including the rights . . . to seek dismissal of the appeals of the Cash Collateral Orders in this Court whether on the same or on different grounds upon which the Bankruptcy Court dismissed the appeals." (Dec. 29, 2009, Order ¶ 1).  The Court also consolidated the appeals (including the then-to-be-appealed final-financing order) and set a briefing schedule thereon.  (*See id.* ¶¶ 2–3).  Later, Aurelius and Icahn Nevada filed motions to intervene as Appellees, which the Court granted.  (*See* Jan. 19, 2010, Order).

20

Case No. 09-23683-CIV-ALTONAGA

* * *

The parties have now fully briefed their positions.  But before the Court may address any errors the Statutory Lienholders complain of, the Court must first address the Motion to Dismiss of the Term Lenders, who have moved to dismiss the appeals of the financing orders and the disputed cash-collateral orders.  That is because the Term Lenders argue in large part that the Court lacks jurisdiction, and questions of jurisdiction must generally be decided before the merits.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause." (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868) (internal quotation marks omitted)); *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 779 (11th Cir. 2005) ("[I]n every appeal, 'the first and fundamental question is that of jurisdiction.'" (quoting *Steel*, 523 U.S. at 94)).

## II.  MOTION TO DISMISS

For two reasons, the Term Lenders move to dismiss the appeals of the financing orders and the cash-collateral orders.  First, the Term Lenders contend the appeals of the third and fourth cash-collateral orders are untimely.  Second, the Term Lenders contend the appeals are moot, both "constitutionally" and "equitably."   Similarly, and although not part of the Term Lenders' Motion, Icahn Nevada contends the appeals of the financing orders are "statutorily" moot.  The Court addresses each argument in turn.

**A.    Timeliness**

It is settled that "the timely filing of a notice of appeal is 'mandatory and jurisdictional.' If the notice is not timely filed, the appellate court is without jurisdiction to hear the appeal."

Case No. 09-23683-CIV-ALTONAGA

*Advanced Estimating Sys., Inc. v. Riney*, 77 F.3d 1322, 1323 (11th Cir. 1996) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 61 (1982)). The Statutory Lienholders did not file notices of appeal of the third and fourth cash-collateral orders within ten days of their entry, as Federal Rule of Bankruptcy Procedure 8002(a) then required. It follows, the Term Lenders contend, that the Court is without jurisdiction to hear the appeals of these orders. The Debtors add that the Statutory Lienholders failed to timely file notices of appeal of the first and second supplemental orders as well. (*See* Br. Debtors 2).

For their part, the Statutory Lienholders contend they were not required to file notices of appeal within ten days of the entry of the orders because the orders were interlocutory and not immediately appealable as of right. In support, they cite the prior appeal of the nonconsensual cash-collateral order. (*See* Resp. to Mot. 22–23 [ECF No. 92]). There, as stated, Judge Gold first held the order, as it concerned the Statutory Lienholders, was "interlocutory in nature" because the issue of priority had not been decided. Judge Gold then declined to exercise interlocutory jurisdiction to determine whether the bankruptcy court erred in authorizing the Debtors to grant a priming lien to the Term Lenders for the Debtors' use of the cash collateral — also because of the outstanding priority issue. The Statutory Lienholders contend Judge Gold's holding that the order is interlocutory is "law of the case."

In addition, although the other disputed cash-collateral orders were not at issue in the appeal, the Statutory Lienholders contend Judge Gold's ruling decided by necessary implication that each was interlocutory as well. *See Guevara v. Rep. of Peru*, — F.3d —, 2010 WL 2426029, at *6 (11th Cir. Jun. 18, 2010) ("[T]he law of the case doctrine applies to all issues decided

expressly or by necessary implication . . . ." (quoting *Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir. 1985)).  Even though the issue of priority has still not been decided, the Statutory Lienholders contend the disputed cash-collateral orders are reviewable anyway.  That is because of the entry of the financing orders, which are final orders and which incorporated the cash-collateral orders and authorized the Debtors to repay the used cash collateral.  (*See* Appellants' Supplemental Br. 1 [ECF No. 139]; *cf. Aaro, Inc. v. Daewoo Int'l (Am.) Corp.*, 755 F.2d 1398, 1400 (11th Cir. 1985) ("Because the order . . . was an interlocutory order not appealable as of right, the order was merged into the final judgment and is open to review on appeal from that judgment.")).  Such authorization, the Statutory Lienholders state, was error without first having determined the legality of the priming liens.  (*See* Appellants' Supplemental Br. 1).

In response to this argument, the Appellees have taken a number of different and not entirely consistent positions.  The Term Lenders disagree with Judge Gold's ruling; they contend the nonconsensual cash-collateral order was final.  (*See* Mot. 22).  If, however, the law-of-the-case doctrine requires the Court to conclude that the disputed cash-collateral orders were interlocutory, then the Term Lenders state they remain interlocutory.  (*See id.*).  That is because the issue of priority, *i.e.*, the reason Judge Gold concluded the order was interlocutory, remains undecided.  So, as Judge Gold did, the Court must dismiss the appeals as interlocutory as well.

For their part, the Debtors do not take issue with Judge Gold's ruling (the Debtors argued in the prior appeal that the nonconsensual cash-collateral order was interlocutory as well).  In fact, they rely on it, and contend the appeal of the disputed cash-collateral orders should be dismissed as interlocutory for "identical reasons."  (Br. Debtors 4).  Adding a slight twist, the

Examiner contends the appeals are not only interlocutory but are "otherwise not ripe for review." (Br. Examiner 3). He states that until the issue of priority is decided, it is unknown whether the Statutory Lienholders have any interest that required adequate protection in the first place. (*See id.*). He thus contends the appeals should be dismissed or stayed until the issue of priority has been decided. (*See id.*). The Statutory Lienholders, in turn, "urge the Court to maintain the status *quo*, pending a determination of the priority issue," if the Court determines that the disputed cash-collateral orders remain interlocutory. (Resp. to Mot. 23).

Because of the parties' various arguments and requests, as well as the unusual procedural posture of these appeals, the Court requested additional briefing by the parties. (*See* May, 14, 2010, Order [ECF No. 123]). In addition, the Term Lenders and the Statutory Lienholders had seemingly requested the Court to depart from Judge Gold's ruling: the Term Lenders asserted the third and fourth cash-collateral orders were final, even though Judge Gold ruled that a materially similar order was interlocutory. The Statutory Lienholders, for their part, had asserted that the disputed cash-collateral orders became "final" on the entry of the financing orders, even though the *reason* Judge Gold concluded they were interlocutory remains. (The Statutory Lienholders now contend the disputed cash-collateral orders are not "final," but reviewable anyway because they merged into the financing orders.)[21] The parties have filed supplemental briefing on these

---

[21] In addition, the Court announced its intention to stay the appeals until the issue of priority had been decided if the parties agreed. (*See* May, 17, 2010, Order 8). That is because all parties agree that any recovery to which the Statutory Lienholders may be entitled depends on their prevailing on the issue of priority; if the Statutory Lienholders do not hold first-priority liens on the Project (now the proceeds of the sale), then they will recover nothing. According to the Statutory Lienholders, the Court should stay the appeals. According to the Examiner, the Court should stay or dismiss the appeals as interlocutory. According to the Term Lenders, Aurelius, and Icahn Nevada, the Court should not stay the appeals. The Trustee, who has since been substituted for the Debtors, took no position.

Case No. 09-23683-CIV-ALTONAGA

and kindred issues.

As stated, Judge Gold held that because the issue of priority had not been decided, the Statutory Lienholders' appeal of the nonconsensual cash-collateral order was interlocutory. Under the law-of-the-case doctrine, "the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *This That & the Other Gift & Tobacco, Inc. v. Cobb Cnty., Ga.*, 439 F.3d 1275, 1283 (11th Cir. 2006) (internal quotation marks omitted). The doctrine, moreover, "bars relitigation of issues that were decided either explicitly or by necessary implication." *Id.* The central purposes of the doctrine "include bringing an end to litigation, protecting against the agitation of settled issues, and assuring that lower courts obey appellate orders." *Id.* Still, the law-of-the-case doctrine "is not an inexorable command that rigidly binds the court to its former decisions." *DeLong Equip. Co. v. Wash. Mills Electro Minerals Corp.*, 990 F.2d 1186, 1196 (11th Cir. 1993) (internal quotation marks omitted). Indeed, a court may free itself from a former decision if, since its entry, "new and substantially different evidence is produced, or there has been a change in the controlling authority or the prior decision was clearly erroneous and would result in a manifest injustice." *This That & the Other Gift & Tobacco*, 439 F.3d at 1283 (internal quotation marks, punctuation, and numeration omitted).

The Court accepts, and the Term Lenders do not appear to dispute, that the prior ruling is indeed law of the case. *Cf. Myers v. Raynor* (*In re Raynor*), 406 B.R. 375, 379 (B.A.P. 8th Cir. 2009) ("[W]here appellants in a bankruptcy case, who had previously appealed to the United States District Court, sought further review from a different order of the same issues, the

25

bankruptcy appellate panel found 'that the law of the case doctrine should be applied to limit our review to issues not previously decided by the District Court.'" (quoting *Woods v. Kenan* (*In re Woods*), 215 B.R. 623, 625 (B.A.P. 10th Cir. 1998)).  The Court must therefore follow the ruling, and similarly conclude that each disputed cash-collateral order was interlocutory,[22] unless an exception to the law-of-the-case doctrine applies.  No new evidence has been produced, and the controlling authority has not changed.  So the inquiry is confined to whether the prior ruling was clearly erroneous and would result in a manifest injustice.

"A final decision is generally 'one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'"  *Charter Co. v. Prudential Ins. Co. of Am.* (*In re Charter Co.*), 778 F.2d 617, 621 (11th Cir. 1985) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)).  This the nonconsensual cash-collateral order did not do; under this standard, not only was the ruling not clearly erroneous, it was eminently correct.  The Term Lenders nevertheless argue persuasively that the order was final when entered, especially in light of "the more flexible standard of finality in appeals of bankruptcy orders."  *OB/GYN Solutions, L.C. v. Six* (*In re Six*), 80 F.3d 452, 455 (11th Cir. 1996).  But there is no need to address the details here.  The Term Lenders do not argue that the prior ruling would result in a manifest injustice even if it were clearly erroneous: it is hard, frankly, to see how any manifest injustice

---

[22]  The Court similarly accepts, as the Statutory Lienholders contend, that the issue whether each disputed cash-collateral order was interlocutory was decided "by necessary implication."  Judge Gold, to be sure, ruled on the nonconsensual cash-collateral order only.  Yet each order was substantially similar.  And at any rate the issue regarding the priming liens with each order was the same.  So even though, in ruling on the nonconsensual cash-collateral order, an argument may be made that Judge Gold did not technically rule "by necessary implication" that the other orders were interlocutory as well, the Court would not — barring an exception — revisit the issue whether each order was interlocutory or final anyway.

would result. Accordingly, because no exception to the law-of-the-case doctrine applies, the Court concludes that the disputed cash-collateral orders were interlocutory with regard to the Statutory Lienholders. *Cf. Klay v. All Defendants*, 389 F.3d 1191, 1199 n.7 (11th Cir. 2004) ("Absent an erroneous ruling that would work manifest injustice, consistency between appellate panels is mandated even if a subsequent panel would have decided a case differently than the prior panel." (citing *United States v. Burns*, 662 F.2d 1378, 1384 (11th Cir. 1981)).

Although the Court accepts Judge Gold's ruling regarding the interlocutory nature of the disputed cash-collateral orders, the Court may, and in fact must, exercise jurisdiction, for two reasons. First, the Court need not decline to exercise jurisdiction, as Judge Gold did, unless his decision to decline jurisdiction is also law of the case and no exception applies. Again, the law-of-the-case doctrine applies to findings of fact and conclusions of law. *See This That & the Other Gift & Tobacco, Inc.*, 439 F.3d at 1283. Judge Gold's decision to decline to exercise jurisdiction was not a finding of fact, nor was it a conclusion of law. A conclusion of law is "[a]n inference on a question of law, made as a result of a factual showing, no further evidence being required; a legal inference." BLACK'S, *supra*, at 308. Judge Gold's decision to decline jurisdiction was not a legal inference but rather an exercise of discretion. *See* 28 U.S.C. § 158(a)(3) (allowing interlocutory appeals "with leave of court"); *see also In re Delta Res., Inc.*, 54 F.3d 722, 726 (11th Cir. 1995) (applying an abuse-of-discretion standard to a district court's decision on a motion for leave to appeal a bankruptcy court's interlocutory order); *In re Charter Co.*, 778 F.2d at 622 (same). As *In re Delta Resources, Inc.* and *In re Charter Co.* illustrate, under an abuse-of-discretion standard two courts could reasonably come to contrary conclusions.

Case No. 09-23683-CIV-ALTONAGA

Since Judge Gold's exercise of discretion was not a conclusion of law, the law-of-the-case doctrine does not bind the Court to his prior decision to decline to exercise jurisdiction. Therefore the Court need not, as the Appellees contend, dismiss the appeals simply because the issue of priority remains outstanding.

Second, the procedural posture of the case is now different because the parties have appealed final orders. The parties do not dispute the finality of the financing orders or the examiner order, and the Statutory Lienholders timely appealed those orders. The Statutory Lienholders also sought appellate review of the orders at the appropriate juncture; nothing more concerning the financing orders needed to be done. *See In re Charter Co.*, 778 F.2d at 621 ("In bankruptcy proceedings, it is generally the particular adversary proceeding or controversy that must have been finally resolved, rather than the entire bankruptcy litigation. Although courts take a more liberal view of what constitutes a separate dispute for purposes of appeal in bankruptcy cases, the separate dispute being assessed must have been finally resolved and leave nothing more for the bankruptcy court to do." (citations and internal quotation marks omitted)). Thus, these appeals are timely filed, and the Court has jurisdiction to hear them under 28 U.S.C. § 158(a) — which it must exercise. *See* 28 U.S.C. § 158(a)(1) ("The district courts . . . *shall* have jurisdiction to hear appeals . . . from final judgments, orders, and decrees . . . ." (emphasis added)).

In addition, as the Statutory Lienholders state, the financing orders incorporated the cash-collateral orders and authorized the Debtors to repay the used cash collateral to the Term Lenders. An appeal of the financing orders thus necessarily entails review of the interlocutory

28

cash-collateral orders.  And given that the Statutory Lienholders sought appellate review of the financing orders at the appropriate juncture, the logical conclusion is that now is the appropriate time to review the cash-collateral orders.  The Appellees' suggestion — that the Court must wait until the issue of priority has been decided — simply makes no sense because there is nothing left for the bankruptcy court to do *in this proceeding*.  *See In re Charter Co.*, 778 F.2d at 621. There is nothing left, *i.e.*, no other order which the bankruptcy court might issue, for the Statutory Lienholders to appeal from.  A decision on the issue of priority in a separate adversary proceeding is not the answer.  *See id.*

For the foregoing reasons, the Court has jurisdiction to hear these appeals under 28 U.S.C. § 158(a).

**B.      Mootness**

The burden of establishing mootness is on the party seeking dismissal.  *See Beta Upsilon Chi Upsilon Chapter at the Univ. of Fla. v. Machen*, 586 F.3d 908, 916 (11th Cir. 2009).

1.      *Constitutional Mootness*

The Term Lenders contend the appeals of the financing orders are constitutionally moot because the Court "cannot fashion any effective relief that would alter the outcome [the Statutory Lienholders] seek to change — *i.e.*, indefeasible repayment in full of the Used Cash Collateral under the Financing Orders."  (Mot. 15).  The appeals of the disputed cash-collateral orders are also moot, the Term Lenders contend, for the same reason.  (*See id.* 17).  This conclusion owes to three provisions in the cash-collateral orders and to the Debtors' grant of priming liens to Icahn Nevada under the financing orders.  First, paragraph 11(e) prohibited the Debtors from granting

Case No. 09-23683-CIV-ALTONAGA

liens that "primed" the Term Lenders' adequate-protection or priming liens without first repaying the used cash collateral to the Term Lenders. Because the Debtors granted priming liens to Icahn Nevada under the financing orders, paragraph 11(e) required the repayment to be made. (*See id.* 16–17). Second, paragraph 6(a) gave the Term Lenders adequate-protection liens on the Debtors' pre- and postpetition assets, which included the funds Icahn Nevada advanced to the Debtors under the DIP facility. It is the Term Lenders' adequate-protection liens, not the Statutory Lienholders' liens, that attach to those funds. (*See id.*). Third, paragraph 16 provided that no later modification, amendment, or vacatur of the cash-collateral orders could affect the liens that were previously granted to the Term Lenders. (*See id.* 18). According to the Term Lenders, each of these provisions, the inclusion of which the Statutory Lienholders never objected to, prevents the Court from granting any effective relief.

It is settled that "Article III of the Constitution limits the jurisdiction of the federal courts to the consideration of 'Cases' and 'Controversies.'" *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335 (11th Cir. 2001) (quoting U.S. CONST. art. III, § 2). The doctrine of constitutional mootness (known to attorneys who do not practice bankruptcy law as simply "mootness") "derives directly from the case-or-controversy limitation because an action that is moot cannot be characterized as an active case or controversy." *Id.* (internal quotation marks omitted). The U.S. Court of Appeals for the Eleventh Circuit discussed the doctrine at length in *BankWest, Inc. v. Baker*:

> As the Supreme Court has defined the doctrine of mootness, a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. A case can become moot either due to a change in factual circumstances, or due to a change in the law. If a lawsuit is mooted by subsequent developments, any decision a federal court might render on the merits of the case would constitute an impermissible advisory opinion. An appellate court simply does

30

> not have jurisdiction under Article III to decide questions which have become moot by reason of intervening events.  The Article III case or controversy requirement mandates that the case be viable at all stages of the litigation; it is not sufficient that the controversy was live only at its inception.  We determine on a case-by-case basis whether a case or controversy exists.

446 F.3d 1358, 1364 (11th Cir. 2006) (citations, alterations, and internal quotation marks omitted).

In *Church of Scientology v. United States*, the Supreme Court reduced the test for whether a case has become moot on appeal to this: "[I]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party, the appeal must be dismissed."  506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).  But "[a] case does not become moot simply because an appellate court is unable completely to restore the parties to the *status quo ante*."  *SunAm. Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325, 1333 (11th Cir. 1996) (citing *Church of Scientology*, 506 U.S. at 12–14)).  "The ability of the appellate court to 'effectuate a partial remedy' is sufficient to prevent mootness."  *Id.* (quoting *Church of Scientology*, 506 U.S. at 13).

Under this test, the appeals are not constitutionally moot.  The Statutory Lienholders contend that, thanks to the financing orders, the value of their interests in the Debtors' assets has been decreased by an amount equivalent to the priming lien granted to Icahn Nevada.  They further contend the bankruptcy court unlawfully authorized the Debtors to disburse funds from the DIP facility to the Term Lenders, the Examiner, and other professionals.  The Statutory Lienholders seek an order requiring the return of such funds to the estate pending a determination of the issue of priority.  The Court has the power — that is, "the raw ability," *In re UNR Indus., Inc.*, 20 F.3d 766, 768 (7th Cir. 1994) — to enter such an order.  Disgorging the funds, moreover, "can be carried into

31

effect" and would certainly "affect the matter in issue in the case before it." *Mills*, 159 U.S. at 653;

*cf. In re Cont'l Airlines*, 91 F.3d 553, 569 (3d Cir. 1996) (en banc) (Alito, J., dissenting) ("[I]t is

clear that a determination of the merits of the issues raised . . . and the entry of a remedial order on

the basis of such a determination would have 'some effect' — and potentially quite a substantial

effect — in the real world.  (That is precisely why Continental does not want us to entertain the

appeal!).").

The Term Lenders argue persuasively how the provisions of the cash-collateral orders may

(or were intended to) operate.  Even so, the Term Lenders have not established that the provisions

operate in such a way that makes it *impossible* for the Court to grant any effectual relief whatever,

which is the relevant test.  *See Church of Scientology*, 506 U.S. at 12; *In re UNR Indus.*, 20 F.3d at

768.  As an initial matter, the Statutory Lienholders disagree with the Term Lenders' interpretation

of the provisions: they contend, for example, that the way the bankruptcy court authorized paragraph

11(e) to be used vis-à-vis the financing orders, *i.e.*, as a "de facto priming lien," would destroy

paragraph 19(b) of the cash-collateral orders, which authorized the Statutory Lienholders to preserve

their liens, despite anything contrary in the orders.  (*See* Resp. to Mot. 10–14).  The Statutory

Lienholders, moreover, contend they have appealed the disputed cash-collateral orders and the

financing orders in whole, "not merely sections of" them: orders may be vacated *in toto*.  (*Id.* 15).

If the Court were to agree with the Statutory Lienholders' interpretation, disagree with the Term

Lenders', reverse or modify the orders, or do some combination of the three, it is far from clear

whether the provisions on which the Term Lenders rely would continue to operate in the manner the

Term Lenders contend they do.  At any rate it seems doubtful that constitutional mootness could

hinge on an appellate court's interpretation of an order entered below; the Term Lenders have cited no such authority to that effect. Additionally, the Court could restrict the application of paragraph 11(e). Or, even more simply, the parties could comply with any order of remediation. Defining the contours of the circumstances in which a case may become constitutionally moot is not always a clear task. *See* 13B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3533.1, at 728 (3d ed. 2008). These appeals, however, do not fit the bill.

What's more, no definable *event* has occurred that has made it impossible for the Court to grant any effectual relief whatever. *See BankWest*, 446 F.3d at 1364 ("A case can become moot either due to a change in *factual circumstances*, or due to a change in *the law*." (alterations and internal quotation marks omitted) (emphasis added)). It is true, of course, that the bankruptcy court has entered the financing orders. In addition, Icahn Nevada has lent the Debtors post-petition financing under section 364(d) and has bought the Debtors' assets under section 363(c). All parties agree, and the bankruptcy court has found, that Icahn Nevada acted in good faith. So the Bankruptcy Code may protect Icahn Nevada from the effects of any reversal or modification of the orders entered below. *See* 11 U.S.C. §§ 363(m), 364(e); *see also infra* Part II.B.3. And therefore returning the parties to the *status quo ante* may, for all intents and purposes, be "impossible" because Icahn Nevada is in the way. But these sections, which restrict the Court's ability to fashion full relief, arise from the Bankruptcy Code, not Article III. *See In re UNR Indus.*, 20 F.3d at 769; COLLIER, *supra*, ¶ 363.11, at 363-75 (discussing the doctrine of "statutory mootness"). In light of the test for mootness announced in *Church of Scientology*, this distinction is not merely academic: even laws can be repealed, enjoined, or held unconstitutional, and so it may not *literally* be impossible to return

to the way things were.  At any rate, these sections protect Icahn Nevada, not the Term Lenders or other parties.  Accordingly, although the availability of relief a court may fashion has indeed been restricted, a court can still fashion *some* relief (in fact, a court can grant most of what the Statutory Lienholders seek).  That suffices to prevent these appeals from being dismissed as constitutionally moot.  *See Church of Scientology*, 506 U.S. at 13; *SunAm. Corp.*, 77 F.3d at 1333.

2.  *Equitable Mootness*

The Term Lenders also contend the appeals are "equitably" moot.  According to the Term Lenders, "excising the indefeasible payment of the Used Cash Collateral from the Financing Orders would knock out the critical prop without which the Debtors could not have obtained the post-petition financing that the Court found to be necessary to preserve the Project."  (Mot. 4).  In addition, the financing orders were "one element of a global agreement" according to which the Debtors obtained post-petition financing to sell their assets.  (*Id.*).  Under the financing orders and the November 24 bidding-procedures order, the Term Lenders consented to the sale of the assets and to the allowance of a DIP lender to "credit bid" the amount of the DIP facility as part of the "*quid pro quo*" for the DIP lender's agreement to advance the funds needed to repay the cash collateral the Debtors had used.  (*See id.* 4–5).  Once the orders were entered, state the Term Lenders, the global agreement was "cemented" in place because Icahn Nevada could then "credit bid" the DIP facility to acquire the assets or, if there were no sale, foreclose on the priming liens.  (*Id.* 5).  Last, the Statutory Lienholders delayed in taking their appeal: eleven days after the bankruptcy court orally approved the interim-resort-financing order and nine days after the bankruptcy court entered the order.  (*See id.*).  By the time the Statutory Lienholders had moved for a stay pending resolution of

34

the appeals, moreover, most of the disbursements had been made. Nor did the Statutory Lienholders post the requisite bond to obtain the stay.

Unlike constitutional mootness, equitable mootness does not take origins in the Article III case-or-controversy requirement. *See* 13B WRIGHT ET AL., *supra*, § 3533.2.3, at 897. The doctrine, according to which courts dismiss appeals as "moot," "is a pragmatic principle, grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *Mac Panel Co. v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th Cir. 2002); *accord In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005); *In re Zenith Elecs. Corp.*, 329 F.3d 338, 343 (3d Cir. 2003). In an oft-quoted passage in which he decried the phrase "equitable mootness," Judge Easterbrook of the U.S. Court of Appeals for the Seventh Circuit distinguished the doctrine from constitutional mootness as follows:

> There is a big difference between *inability* to alter the outcome (real mootness) and *unwillingness* to alter the outcome ("equitable mootness"). Using one word for two different concepts breeds confusion. Accordingly, we banish "equitable mootness" from the (local) lexicon. We ask not whether this case is moot, "equitably" or otherwise, but whether it is prudent to upset the plan of reorganization at this late date.

*In re UNR Indus.*, 20 F.3d at 769; *see also In re Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994) (Posner, J.) ("The now nameless doctrine is perhaps best described as merely an application of the age-old principle that in formulating equitable relief a court must consider the effects of the relief on innocent third parties.").[23]

---

[23] No panel of the Eleventh Circuit has enjoined the use of the term "equitable mootness," and so the Court, for lack of a better phrase, uses it here. Along the same vein, a curious feature of the Eleventh

Case No. 09-23683-CIV-ALTONAGA

The Eleventh Circuit laid down the standard for equitable mootness in the context of an

appeal from an order confirming a plan of reorganization:

> Central to a finding of mootness is a determination by an appellate court that it
> cannot grant effective judicial relief.  Put another way, the court must determine
> whether the reorganization plan has been so substantially consummated that effective
> relief is no longer available. . . .  Even if substantial consummation has occurred, a
> court must still consider all the circumstances of the case to decide whether it can
> grant effective relief.
>
> The test for mootness reflects a court's concern for striking the proper balance
> between the equitable considerations of finality and good faith reliance on a judgment
> and the competing interests that underlie the right of a party to seek review of a
> bankruptcy court order adversely affecting him.

*First Union Real Estate Equity & Mortg. Invs. v. Club Assocs.* (*In re Club Assocs.*), 956 F.2d 1065,

1069 (11th Cir. 1992) (internal quotation marks, citation, and footnote call number omitted).[24]  The

---

Circuit's jurisprudence in this area is that it has never in a published opinion characterized an appeal from
a bankruptcy court order as "constitutionally" moot or "equitably" moot; in its chief decisions on mootness
in the bankruptcy context, the Eleventh Circuit has simply addressed whether such appeals are "moot."  *See
Russo v. Seidler* (*In re Seidler*), 44 F.3d 945 (11th Cir. 1995); *First Union Real Estate Equity & Mortg. Invs.
v. Club Assocs.* (*In re Club Assocs.*), 956 F.2d 1065 (11th Cir. 1992); *Smith v. United States* (*In re Holywell
Corp.*), 911 F.2d 1539 (11th Cir. 1990), *rev'd* 503 U.S. 47 (1992); *Holywell Corp. v. Bank of N.Y.* (*In re
Holywell Corp.*), 901 F.2d 931 (11th Cir. 1990); *Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 838 F.2d 1547 (11th
Cir. 1988); *Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 820 F.2d 376 (11th Cir. 1987); *Gwinnett Bank & Trust
Co. v. Matos* (*In re Matos*), 790 F.2d 864 (11th Cir. 1986); *Sewanee Land, Coal & Cattle, Inc. v. Lamb* (*In
re Sewanee Land, Coal & Cattle, Inc.*), 735 F.2d 1294 (11th Cir. 1984).  This is not to say, however, that the
Eleventh Circuit does not recognize the doctrine.  To the contrary, the court has recently held in unpublished
decisions that appeals from confirmation orders were "equitably moot."  *See Virtus Capital LP v. Allied
Holding, Inc.* (*In re Allied Holding, Inc.*), 291 F. App'x 257, at *1 (11th Cir. 2008); *Liquidity Solutions, Inc.
v. Winn-Dixie Stores, Inc.* (*In re Winn-Dixie Store, Inc.*), 286 F. App'x 619, 620 (11th Cir. 2008); *Gary J.
Rotella & Assocs., P.A. v. E. Coast Beverage Corp.* (*In re E. Coast Beverage Corp.*), 143 F. App'x 259, 260
(11th Cir. 2005).  In addition, these decisions have recognized certain of the Eleventh Circuit's published
decisions as dealing with equitable mootness.  *See, e.g.*, *In re Winn-Dixie Store*, 286 F. App'x at 623 (citing,
*e.g.*, *Miami Ctr. Ltd. P'ship.*, 838 F.2d at 1555).

[24]  Certain language in *In re Club Associates* appears to be consistent with a constitutional-mootness
analysis.  *E.g.*, 956 F.2d at 1069 ("[T]he court must determine whether the reorganization plan has been so
substantially consummated that *effective relief is no longer available*." (emphasis added) (internal quotation
marks omitted)).  The case, to be clear, concerns equitable mootness.  *See, e.g.*, *In re Winn-Dixie Store*, 286

Case No. 09-23683-CIV-ALTONAGA

mootness inquiry, moreover, "necessarily involves many subsidiary questions":

> Has a stay pending appeal been obtained?  If not, then why not?  Has the plan been
> substantially consummated?   If so, what kind of transactions have been
> consummated?  What type of relief does the appellant seek on appeal?  What effect
> would granting relief have on the interests of third parties not before the court?  And,
> would relief affect the re-emergence of the debtor as a revitalized entity?   The
> answers to these questions provide the reviewing court with the backdrop to evaluate
> the ultimate issue of whether a confirmation plan has progressed to the point where
> effective judicial relief is no longer a viable option.

*Id.* at 1069 n.11.

Although the doctrine of equitable mootness is most commonly applied to avoid disturbing plans of reorganization, *see* 13B WRIGHT ET AL., *supra*, § 3533.2.3, at 897, the doctrine is not a stranger to appeals from other kinds of orders, *see, e.g.*, *In re New Century TRS Holdings, Inc.*, 407 B.R. 576, 586–90 (D. Del. 2009) (liquidation plan); *Aurelius Capital Master, Ltd. v. Tousa Inc.*, Nos. 08-61317-CIV, 08-61335-CIV, 2009 WL 6453077 (S.D. Fla. Feb. 6, 2009) (cash-collateral order); *In re Delta Air Lines, Inc.*, 374 B.R. 516, 522–25 (S.D.N.Y. 2007) (order approving settlement agreement).   Even so, the grounds for applying the doctrine outside the context of plans of reorganization are not as well established; indeed, they have been questioned.   *See In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.*, 592 F.3d 664, 668–69 (5th Cir. 2009) ("It is questionable whether the doctrine of equitable mootness applies to Chapter 7 bankruptcy liquidations."); *In re San Patricio Cnty. Cmty. Action Agency*, 575 F.3d 553, 558 (5th Cir. 2009) (same); *In re New Century TRS Holdings*, 407 B.R. at 587 n.27 (same).   That is because courts have developed the doctrine "in response to the *particular problems* presented by the consummation of

---

F. App'x at 623; *In re Cont'l Airlines*, 91 F.3d at 558; *id.* at 568 (Alito, J., dissenting).

plans of reorganization under Chapter 11." *TNB Fin., Inc. v. James F. Parker Interests* (*In re Grimland, Inc.*), 243 F.3d 228, 231 (5th Cir. 2001) (emphasis added); *accord In re Cont'l Airlines*, 91 F.3d at 571 (Alito, J., dissenting) ("[The doctrine] concerns a federal common law rule designed to promote certain policies of Chapter 11 of the Bankruptcy Code.  These policies are the facilitation of reorganizations and the protection of those who reasonably rely on reorganization plans."). Additionally, there is the twin concern — reflected in cases dealing with plans of reorganization as well — of extinguishing a dissatisfied litigant's right to appellate review and a court's refusing to carry out its "virtually unflagging obligation" to exercise its statutory jurisdiction on the basis of "equity."  *See In re San Patricio Cnty.*, 575 F.3d at 559; *In re Cont'l Airlines*, 91 F.3d at 568 (Alito, J., dissenting) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  So although the Court assumes that the doctrine may apply to appeals of cash-collateral and financing orders, these reasons lend additional weight to the requirement that a court must use caution when deciding whether the doctrine should be applied.  *See In re Zenith Elecs.*, 329 F.3d at 343 ("[T]he doctrine is 'limited in scope' and must be 'cautiously applied.'").

With these principles at the fore, the Court turns to the appeals before it.  As stated, the Term Lenders contend the Statutory Lienholders' request "for 'piecemeal excision' of the provision authorizing repayment of the Used Cash Collateral would, if entertained, undermine and unravel the integrated agreement upon which the Lenders premised their consent." (Mot. 19).  That is true, but only to an extent.  As an initial matter, the Statutory Lienholders do not request the "excision" of any provision.  Nor would granting the Statutory Lienholders the relief they request technically require the "excision" of anything from the orders either: the financing orders have been carried out

according to their terms and would not actually be undone.  What would be "excised" would be the disbursed funds from the accounts of the Term Lenders, the Examiner, and the other professionals. Nevertheless, disgorgement may indeed undermine *post facto* the Term Lenders' consent to the orders connected to the DIP facility and the ultimate sale, *i.e.*, the "global agreement." (*Id.* 20). To the extent they needed to, it is unknown whether the Term Lenders would have consented to the orders otherwise: the bankruptcy court found that repayment was an express condition to the Debtors' ability to obtain the financing, which was necessary to avoid "immediate and irreparable harm." Although the Statutory Lienholders view such finding skeptically since only about 20 percent of the financing was used to stabilize the Project, they have not challenged the finding, so the Court examines it no further.

But undermining the Term Lenders' consent to the "global agreement" does not alone compel a finding of equitable mootness.  In *Aurelius Capital Master, Ltd.*, the decision on which the Term Lenders chiefly rely, as well as the decisions cited therein — *In re Delta Air Lines, Inc.*, 374 B.R. 516 (S.D.N.Y. 2007); *In re Enron Corp.*, 326 B.R. 497 (S.D.N.Y. 2005) — other considerations were at play.  In *Aurelius*, which concerned an appeal from a cash-collateral order, the debtor, because the appellants had failed to obtain a stay, had entered into "numerous transactions with third parties" and satisfied claims related to more than 150 leases it had assumed.  2009 WL 6453077, at *10.  In addition, the court expressed concerns about "unraveling" and "fashioning" a new cash-collateral order at that stage of the bankruptcy: "granting relief . . . poses a threat to the re-emergence of the debtor as a revitalized entity."  *Id.*  In *In re Delta Air Lines* a group of bondholders sought to nullify releases in a settlement agreement in order to bring certain lawsuits.  374 B.R. at 523.  The

court did state that "to nullify the releases while leaving the remainder of the consummated settlement intact would ignore the trade-off that allowed the parties to settle in the first instance." *Id.* (capitalization omitted). But in addition to ignoring the trade-off, the settlement agreement's "undoing would complicate [the debtor's] rights to an important hub of its operations and therefore risks some negative effect on [its] vitality as a reorganized entity." *Id.* at 524.

Last is *In re Enron*, which concerned the enforceability of an exculpation provision in an order confirming a plan of reorganization. 326 B.R. at 498. Reversing the order would have had a much greater effect on the bankruptcy court, the parties, and third parties than would a reversal in this case:

> While it might be possible for the Court to order some effective relief by removing the Exculpation Provision from the plan . . . none of the other factors weigh in favor of granting . . . such relief. The Exculpation Provision was negotiated by all parties . . . and was found by the Bankruptcy Court to have been necessary for the negotiation of the Plan and appropriate under the circumstances. Parties participated in the creation of the Plan under the guarantee that they would receive some limited protection for participating in one of the largest and most complex bankruptcy filings in history. Key employees remained with Enron as a result of being promised some indemnification for their postpetition acts, an offer made by Enron with the Bankruptcy Court's approval. To pull away this string would thus tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition.
>
> Without such protection from liability, key personnel might abandon efforts to help the reorganized debtor entities follow through on the Plan and wind up its affairs. Without the participation of these individuals, the implementation of the Plan might falter, leading to an "unmanageable, uncontrollable situation for the Bankruptcy Court."
>
> . . . .
>
> Moreover, the Court finds that it would be manifestly inequitable at this late stage to modify even this one provision of the Plan that so many parties have relied upon in making various, potentially irrevocable, decisions.

40

Case No. 09-23683-CIV-ALTONAGA

*Id.* at 503–04 (citations omitted).

In *Aurelius*, *In re Delta Air Lines*, and *In re Enron*, reversing or modifying the orders would have touched directly on two key factors courts consider in declining to undo that which has been done: placing at risk the successful reorganization of a debtor and upsetting the reliance interests of third parties. Deciding these appeals, in contrast, would not implicate those concerns. Granting relief to the Statutory Lienholders would not affect the re-emergence of the Debtor as a revitalized entity — there is, of course, no plan of reorganization to unravel. *See In re Club Assocs.*, 956 F.2d at 1069 n.11. Nor would granting relief obviously affect any third parties; the parties who would be affected by a reversal are before the Court. *See In re San Patricio Cnty.*, 575 F.3d at 558–59. The bankruptcy court would be required to order the funds returned to the estate pending a determination of the issue of priority, and to hold proceedings or enter orders to effect such a mandate. To borrow a phrase from the Statutory Lienholders' counsel, that would "not [be] pleasant" for those involved. (Hr'g Tr. 21:14, Mar. 11, 2010). But there is little likelihood of creating an "unmanageable, uncontrollable situation" for the bankruptcy court.

The Term Lenders are correct that the Statutory Lienholders waited nine days from the date the bankruptcy court entered the interim-resort-financing order (or eleven days from when the bankruptcy court announced its ruling from the bench) to move for a stay, and that they failed to obtain one. The failure to move for and obtain a stay are indeed factors in an equitable-mootness analysis. *See In re Club Assocs.*, 956 F.2d at 1069 n.11. But "the absence of a stay does not compel a finding of mootness in all cases." *Id.* at 1070 n.13 (emphasis omitted). And this is one such case. As an initial matter, these appeals differ from Judge Gold's adjudication that the Term Lenders'

41

Case No. 09-23683-CIV-ALTONAGA

appeal from the nonconsensual cash-collateral order was equitably moot.  There, because no stay was

obtained, the Debtors had spent the cash collateral on the Project and getting it back would be largely

impracticable, even if possible; in contrast, here the Debtors distributed the funds to the Term

Lenders, the Examiner, and other professionals.[25]  So Judge Gold's emphasis on the Term Lenders'

failure to obtain a stay of the nonconsensual cash-collateral order does not require the Court to give

the same emphasis to the Statutory Lienholders' failure to obtain a stay of these appeals.

But more to the immediate point, it is not entirely clear whether the *reason* for considering

one's failure to obtain a stay as a factor in an equitable-mootness analysis applies to these appeals

at all.  In regard to reorganizations, "[t]he purpose of a stay . . . is to prevent transactions that might

otherwise occur in reliance on the plan of reorganization and that would be difficult or painful to

undo if the appeal were to succeed."  *In re Cont'l Airlines*, 91 F.3d at 572 (Alito, J., dissenting);

*accord In re UNR Indus.*, 20 F.3d at 769–70 ("The significance of an application for a stay lies in

the opportunity it affords to hold things in stasis, to prevent reliance on the plan of reorganization

while the appeal proceeds.  A stay not sought, and a stay sought and denied, lead equally to the

implementation of the plan of reorganization.").  In regard to sales, the purpose of obtaining a stay

is to protect "the integrity of the sale of the property to a good faith purchaser."  *Miami Ctr. Ltd.*

*P'Ship*, 820 F.2d at 379 (citing *In re Matos*, 790 F.2d at 866).  The Term Lenders, the Examiner, and

other professionals may have relied on the bankruptcy court's orders (although that reliance is

undercut somewhat thanks to the Statutory Lienholders' objections to the entry of the orders; in other

---

[25]  The Statutory Lienholders do not seek to recover any funds the Debtors have spent on the Project. The Court therefore does not need to decide whether recovering those funds, to the extent it would be "possible," would be equitable.

42

Case No. 09-23683-CIV-ALTONAGA

words, the Appellees were on notice of a possible appeal). But these are entities and professionals before the Court, not third parties who have entered into transactions with a debtor who is reorganizing. That the orders have been implemented, moreover, is not entirely relevant. As has been established, the Court has the ability to grant relatively targeted, effectual relief to the Statutory Lienholders; the difficulty inherent in trying to reverse a plan of reorganization is absent.

3.      *Statutory Mootness*

Icahn Nevada contends the appeals of the financing orders are statutorily moot under 11 U.S.C. § 364(e), which provides:

> The reversal or modification on appeal of an authorization under [section 364] to obtain credit or incur debt, or of a grant under [section 364] of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

"The purpose of this provision is to encourage the extension of credit to debtors in bankruptcy by eliminating the risk that any lien securing the loan will be modified on appeal." *In re Saybrook Mfg.*, 963 F.2d at 1493. Section 364(e) "does not preclude reversal but only limits the effect of a reversal." COLLIER, *supra*, ¶ 364.06, at 364-23. In addition, "[i]f the authorization is reversed on appeal, only the postpetition lender is protected under section 364(e)." *Id.* ¶ 364.06[2], at 364-25.

Icahn Nevada is, of course, a postpetition lender. Icahn Nevada, moreover, acted in good faith — a point no party disputes and the bankruptcy court expressly found. Section 364(e) therefore protects Icahn Nevada, so Icahn Nevada would be "carved out" (Hr'g Tr. 49:14, Mar. 11, 2010) of any relief the Court could fashion were the Statutory Lienholders to prevail — also a point no party

Case No. 09-23683-CIV-ALTONAGA

disputes.[26]

It does not follow, however, that the Court must dismiss the appeals of the financing orders as statutorily moot.  First, it is only Icahn Nevada that is protected, not the other Appellees.  Second, section 364(e) would not restrict the Court from reviewing a central question relating to the financing orders: whether the bankruptcy court provided the Statutory Lienholders with adequate protection. To be sure, if they did not receive adequate protection, the Court is not forbidden from granting effective relief.  *See* COLLIER, *supra*, ¶ 364.06[2], at 364-25 ("[I]f the holder of an existing lien obtained a ruling on appeal that it was not adequately protected when another lender obtained authorization to prime its lien, the remedy would not be to vacate the new lender's senior lien, but rather to provide the existing lender with additional protection or with priority under section 507(b)."). The Statutory Lienholders claim the value of their interests in the Debtors' assets has been decreased by the amount of the priming lien, and the proceeds of the DIP facility have been disbursed unlawfully.  The Court sees no obvious impediment to being able to recover those funds.

* * *

The orders on appeal are neither untimely nor moot.  The Court therefore denies the Term Lenders' Motion, and proceeds to the merits of the appeals.

### III.  STANDARDS OF REVIEW

The Court reviews "the bankruptcy court's factual findings for clear error and its resolution of any legal questions *de novo*."  *Coady v. D.A.N. Joint Venture III, L.P.* (*In re Coady*), 588 F.3d

---

[26] Furthermore, based on the relief the Statutory Lienholders seek on appeal — redistribution of the proceeds from the sale — Icahn Nevada contends the Statutory Lienholders' "circumscribed relief is of no concern to Icahn Nevada."  (Statement Opp'n to a Stay 2 [ECF No. 125]).

1312, 1315 (11th Cir. 2009).   The Court reviews the bankruptcy court's findings of adequate protection for clear error.   *Chrysler Credit Corp. v. Ruggiere* (*In re George Ruggiere Chrysler-Plymouth, Inc.*), 727 F.2d 1017, 1019 (11th Cir. 1984).   For a finding to be clearly erroneous, the Court, "after reviewing all of the evidence, must be left with the definite and firm conviction that a mistake has been committed."   *Dresdner Bank AG v. M/V Olympia Voyager*, 465 F.3d 1267, 1275 (11th Cir. 2006) (internal quotation marks omitted).

## IV.  ANALYSIS

The Statutory Lienholders contend the bankruptcy court erred in a number of ways, each of which is connected to the entry of the financing orders.   First, the bankruptcy court erred by authorizing the Debtors to obtain postpetition financing from Icahn Nevada on a priming basis under the financing orders because the Debtors did not provide the Statutory Lienholders with adequate protection.   (*See* Br. Appellants 12).   The bankruptcy court also erred by authorizing in accordance with the financing orders the repayment of the used cash collateral to the Term Lenders and the payment of the Examiner and other professionals.   (*See id.* 12–13).   That is largely because the bankruptcy court had previously erred by authorizing the Debtors to grant priming liens to the Term Lenders under the cash-collateral orders, and by authorizing the payment of the Examiner on a priming basis without giving the Statutory Lienholders adequate protection.   (*See id.* 13–14).   The Court will address each issue in turn.

## A.    The Financing Orders

Section 364(d) of the Bankruptcy Code provides that if a debtor "cannot obtain credit otherwise, the court may authorize 'priming' an existing lien, i.e., borrowing secured by a lien senior

Case No. 09-23683-CIV-ALTONAGA

to or equal to an existing lien, provided that the existing lienor is adequately protected." COLLIER, *supra*, ¶ 364.01, at 364-3 to -4. Here, the bankruptcy court authorized the "priming" of existing liens: in accordance with the financing orders, the Debtors granted a lien senior to those held by the Statutory Lienholders to Icahn Nevada in order to secure the DIP facility. The Statutory Lienholders do not contend the Debtors failed to put forth evidence that they could not have obtained such postpetition financing otherwise. The Statutory Lienholders do contend, however, that the Debtors did not establish that the Statutory Lienholders were adequately protected.

Before addressing whether there was adequate protection, however, the Court must first address whether the Statutory Lienholders were entitled to adequate protection at all. The Examiner and, to a lesser extent, the Debtors, contend the Statutory Lienholders have yet to prove that their liens are senior in priority to the Term Lenders', and thus that they have any interest in the Project that would require adequate protection. (*See* Br. Examiner 2; Br. Debtors 4 & n.16; *id.* 8 n.25). The bankruptcy court, moreover, added that "the Statutory Lienholders failed to prove the validity, priority or extent of their Liens and claims against any or all of the Debtors or their assets." (Final-Financing Order ¶ E(vi) n.7).[27]

It is true the Statutory Lienholders have yet to *prove* that they were entitled to adequate protection. But that is because they have not yet had the opportunity to do so; indeed, that issue will be decided in the adversary proceedings. In accordance with the bankruptcy court's orders, the Statutory Lienholders have filed proofs of claim asserting the amount of their liens and their first-

---

[27] Despite this statement, the bankruptcy court did not affirm that the Statutory Lienholders were not entitled to adequate protection. (The bankruptcy court did make such a finding, however, with regard to the retail component, because it found that it was valueless on a "stand-alone basis.")

Case No. 09-23683-CIV-ALTONAGA

priority position. (*See* Br. Appellants 15; Appellants' Reply Br. 21 [ECF No. 93]).[28]  The Statutory

Lienholders were therefore entitled to adequate protection for the value of their interests in the

Project.  *See* Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with

these rules shall constitute prima facie evidence of the validity and amount of the claim.").[29]

With that settled, the Court returns to the question whether the value of the Statutory

Lienholders' interests in the Project was adequately protected.  When adequate protection is required

under section 364, among other sections, the Bankruptcy Code lists three means by which it may be

provided: (1) making cash payments, (2) providing additional or replacement liens, or (3) "granting

such other relief . . . as will result in the realization by such entity of the indubitable equivalent of

such entity's interest in such property."  11 U.S.C. § 361(3).  The Debtors did not make cash

payments or provide additional or replacement liens to the Statutory Lienholders.  Thus, to have

primed the Statutory Lienholders' liens, the Debtors, who bear the burden of establishing adequate

---

[28]  On a related note, the Debtors have acknowledged that mechanics' lienholders have filed approximately $615 million in liens against the Project.  (*See* Emergency Mot. Interim & Final Orders ¶ 28; Decl. Karawan ¶ 27 & n.10).

[29]  Citing the "highly contentious circumstances" on the issue of priority, the Debtors contend that "neither Nevada law nor the Appellants' proofs of claims justifies [sic] the supposition that they possess first-priority liens." (Br. Debtors 8 n.25).  The Examiner, for his part, relies on the Term Lenders' filing of an adversary complaint to demonstrate that the issue has been disputed.  (*See* Br. Examiner 2 & n.3).  But neither the "highly contentious circumstances" nor the fact that the issue of priority has been disputed alters the analysis.  Once a claimant files a duly executed proof of claim, "the burden is on the objecting party to go forward with evidence establishing the basis of the objection."  3 William L. Norton, Jr., Norton Bankruptcy Law and Practice § 48:26 (3d ed. 2010).  "The court then determines whether the proof has overcome the prima facie case.  If the objecting party succeeds, the claimant has the burden of persuasion to prove the validity of the claim by a preponderance of the evidence."  *Id.*  Here, neither the Debtors nor the Examiner has cited where in the record an objecting party has put forth *evidence* establishing its objection.  But assuming an objecting party has, the bankruptcy court does not appear to have yet made any determination on such proof.  And without such a finding, the Statutory Lienholders would not yet have had an opportunity to prove the validity of their claims.

47

Case No. 09-23683-CIV-ALTONAGA

protection, *see id.* § 364(d)(2), must have established that the relief granted to the Statutory Lienholders "will result in the realization by [the Statutory Lienholders] of the indubitable equivalent of [their] interest in such property," *id.* § 361(3).

The term "indubitable equivalent" takes origin in a passage Judge Learned Hand penned in defining "adequate protection" under a predecessor statute:

> It is plain that 'adequate protection' must be completely compensatory . . . . [A] creditor who fears the safety of his principal will scarcely be content with [interest]; he wishes to get his money or at least the property.  We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

*Metro. Life Ins. Co. v. Murel Holding Corp.* (*In re Murel Holding Corp.*), 75 F.2d 941, 942 (2d Cir. 1935).  The Hand formula (on adequate protection) may not have been codified in section 361(3) in full, however:

> Unlike the *Murel* case . . . section 361(3) requires only the indubitable equivalent, not the *most* indubitable equivalence. . . .  [C]ollateral need not be replaced with an identical type of collateral.  Certainly, a trustee or debtor in possession may substitute tangible collateral for cash collateral or provide a stream of payments to compensate an entity for the declining value of its collateral.  The adequacy of protection must be determined on a case by case basis.

COLLIER, *supra*, ¶ 361.03[4], at 361-18.

Still, though courts applying section 361(3) may not require adequate protection to be "of the most indubitable equivalence," they have required adequate protection to be "completely compensatory," or nearly so.  *See, e.g.*, *Martin v. United States* (*In re Martin*), 761 F.2d 472, 476 (8th Cir. 1985) ("[A] debtor, in structuring a proposal of adequate protection for a secured creditor, 'should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights.'" (quoting *Crocker Nat'l Bank v. Am. Mariner Indus., Inc.* (*In re Am.*

*Mariner Indus., Inc.*), 734 F.2d 426, 435 (9th Cir. 1984), *overruled on other grounds by United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988))); *Citicorp N. Am., Inc. v. Murray* (*In re Chi., Mo. & W. Ry. Co.*), 109 B.R. 308, 313 (N.D. Ill. 1989) ("Since Congress relied on [Hand's] passage in enacting section 361(3), we may presume that it wished adequate protection to be 'completely compensatory.'"); *In re Ziegler*, 88 B.R. 67, 70–71 (Bankr. E.D. Pa. 1988). That is because ensuring that a creditor receives the value for which it bargained before the debtor had filed for bankruptcy is the principle's *raison d'être*. *See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc.* (*In re Swedeland Dev. Grp., Inc.*), 16 F.3d 552, 564 (3d Cir. 1994) (en banc); COLLIER, *supra*, ¶ 361.03[1], at 361-11. In a leading decision on section 361(3), the U.S. Court of Appeals for the Third Circuit, sitting en banc, discussed how adequate protection may be provided thereunder:

> [A] proposal depending upon a pre-petition lender having adequate protection, no matter its form, should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights. Whether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given to the post-petition loan. In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing.

*In re Swedeland Dev. Grp.*, 16 F.3d at 564 (citation and internal quotation marks omitted).

Here, the value of the Statutory Lienholders' liens against the Project far exceeded the value of the Project.[30] The Debtors were required only to provide adequate protection for the latter,

---

[30] This appears to be undisputed, although citations to valuations of the Debtors' assets are hardly legion. A May 2009 appraisal estimated the value of the Project at $318.7 million, and Icahn Nevada later bought the Project (if one includes the $51 million DIP facility) for $156 million. At any rate, at least $615 million in mechanics' liens have been filed against the Project. Although it is not entirely transparent from

Case No. 09-23683-CIV-ALTONAGA

however.  *See* COLLIER, *supra*, ¶ 361.02[2], at 361-4.  That is because "protection is required only for the value of an entity's interest in the property."  *Id.*  And the value of an entity's interest in the property means the value of the collateral.  *See Orix Credit Alliance, Inc. v. Delta Res., Inc.* (*In re Delta Res., Inc.*), 54 F.3d 722, 728 (11th Cir. 1995) (quoting *Timbers*, 484 U.S. at 372)).  It follows that, to have granted a priming lien to Icahn Nevada for the amount of the DIP facility (which therefore decreased the value of the Statutory Lienholders' interests in the Debtors' assets by the same amount), the Debtors were required to have established that the Statutory Lienholders' interests in the Project were adequately protected.

The bankruptcy court heard evidence on the matter at a series of hearings, the first of which was with respect to the interim-resort-financing order.  There, the Debtors elicited testimony about how the DIP facility provided adequate protection to the Statutory Lienholders and other creditors.  According to Howard Karawan, the Debtors' chief-restructuring officer, if the Debtors did not obtain the DIP financing, they would "pretty much shut down."  (*See* Hr'g Tr. 144:21, Nov. 23, 2009).  Karawan testified further that the DIP financing was "a necessity" (*id.* 145:9), because it would allow the Debtors to protect the building and allow the Debtors to effect a sale.  "Without it . . . I don't believe we have any other option but to walk away from this asset.  We have no money, and we have nowhere else to turn, I believe."  (*Id.* 154:16–19).  Deven Kumar, senior vice president of development of Fontainebleau Las Vegas, testified about the harm that could befall the Project without the DIP financing.  If there were a "true, direct rain storm" (*id.* 168:23), he stated, over 50

the record, the Court assumes it was the Statutory Lienholders who filed those liens.  Therefore, the Statutory Lienholders were undersecured.

percent of the rooms could be damaged (*see id.* 169:10), amounting "to about $90 million" (*id.* 171:17).

Of all the witnesses, the Examiner testified most pointedly about adequate protection.  He stated the DIP facility not only "enhances the ability to conduct the sale process, but . . . it also enhances the value of the assets."  (*Id.* 189:21–23).  On the expenses allocated for the professionals, "there are some professionals that are going to be absolutely necessary to carry out the sale process, and . . . if [the Statutory Lienholders] are in a first priority position, . . . the sale process will directly benefit [them]."  (*Id.* 190:9–14).  On the nearly $18 million repayment of the used cash collateral to the Term Lenders, the Examiner testified:

> In my role as examiner, I am bound by the order that was entered in this Court, and one of the things that order indicates is that I must adhere to orders that have previously been entered by this Court, and based on my understanding, there have been orders entered by the Court that directly relate to the property's ability and the estate's ability to get new financing, and any financing that does not provide for the takeout of that cash collateral that has been used cannot be approved by the Court.
>
> So . . . it benefits the estate because . . . there is no other way I can bring money into the estate.

(*Id.* 190:25–191:14).  Above all, "one of the primary forms" of adequate protection is the fact that the Project "is being stabilized and safeguarded from deterioration and damage." (*Id.* 208:19–23).

The bankruptcy court approved the DIP facility at the end of the hearing (*see id.* 224:18–228:12), and then entered the interim-resort-financing order.  The order contained the following findings under the heading "Necessity and Adequate Protection":

> The Sale clearly benefits all creditors claiming an interest in the property subject thereto.  As the unrefuted testimony at the Interim Hearing amply demonstrates, absent the Sale, the Debtors will have no choice but to abandon their interests in the Project and their other assets subject of the Sale.  The testimony at the

Interim Hearing also amply demonstrates that the expenses provided for in the Agreed Budget are the reasonable, necessary costs and expenses of preserving the value of the Debtors' assets or disposing of the Debtors' assets pursuant to the Sale. Absent such expenditures, the value of the property would be severely threatened and would decline significantly.  Even those costs and expenses which are not directly related to the Sale must be incurred by the Debtors to accomplish the Sale in chapter 11, which, under Section 363 of the Bankruptcy Code, can only be performed by the Debtors (in this case, under the supervision of the Examiner).  This includes the repayment of the Used Cash Collateral which, pursuant to prior Orders entered by the Court, is required in order to obtain financing under the DIP Credit Facility. Therefore, the Debtors' estates will suffer immediate and irreparable harm absent approval of the DIP Credit Facility and each of the Debtors' expenditures in accordance with the Agreed Budget.  Moreover, in the face of the many bona fide disputes concerning the validity, priority and extent of liens and claims in respect of the Debtors' property, the alternative to the Sale portends protracted litigation during which such property shall go without protection, security or maintenance and be subjected to the risk of catastrophic damage and the accompanying decline in value. Moreover, the ensuing loss of the Debtors' remaining employees will adversely affect continuing management and protection of the Debtors' property and the ability to provide information essential to the preservation of the property after the Debtors' abandonment of its [sic] interests therein.  In view of the foregoing, and based on the unrefuted testimony at the Interim Hearing, the Court finds and concludes that the interests of all entities holding liens in any property comprising the DIP Collateral . . . who have not otherwise consented to the DIP Motion are adequately protected as required by Section 364(d) of the [B]ankruptcy Code.

(Interim-Resort-Financing Order ¶ E(vi)).

This evidence establishes that the DIP financing was necessary to preserve, and possibly even enhance, the value of the Debtors' assets and to bring the sale to a conclusion.  In this regard the record supports the bankruptcy court's findings.  But these findings do not support the bankruptcy court's conclusion that the Statutory Lienholders were adequately protected.  To the contrary, these findings are somewhat beside the point.  Because the Statutory Lienholders were due to be "primed," the inquiry ought to have focused on compensating the Statutory Lienholders for the loss of value of their interests in the Project *caused by the priming lien*.  *See In re Swedeland Dev. Grp.*, 16 F.3d

at 564 ("Whether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value *caused by the superpriority given to the post-petition loan*." (emphasis added)); COLLIER, *supra*, ¶ 361.03[5][b], at 361-21 ("The inquiry must evaluate that which is offered as a replacement."). Since the Statutory Lienholders were undersecured, the $51 million priming lien would decrease the value of their interests in the Debtors' assets by the same amount. Before authorizing the Debtors to obtain such credit, the bankruptcy court was therefore required to find that the Statutory Lienholders' resulting decrease in the value of their interests in the Debtors' assets was protected. The Debtors could not simply displace the Statutory Lienholders' liens without doing so. As the quoted language and the testimony at the hearing demonstrate, the bankruptcy court did not make this inquiry or any findings with regard to it. The bankruptcy court clearly erred, therefore, in finding that the Statutory Lienholders were adequately protected.

The cases on which the Debtors and the Examiner rely do not alter this conclusion; to the contrary, they demonstrate that in fashioning adequate protection, courts must seek to compensate a secured creditor for any decrease in the value of its interest caused by the grant of a priming lien or the use of collateral. The Debtors rely on *In re Yellowstone Mountain Club, LLC*, Nos. 08-61570-11, 08-61571-11, 08-61572-11, 08-61573-11, 2008 WL 5875547 (Bankr. D. Mont. Dec. 17, 2008), for the proposition that "adequate protection is not always a dollar for dollar proposition or even amenable to quantification," (Br. Debtors 23–24). To the extent that is true, the case provides wobbly support at best for the bankruptcy court's finding of adequate protection here. There, the debtors, who were operating an exclusive club that was a "vital component of the local economy of Big Sky, Montana," *id.* at *2, sought to borrow about $20 million on a priming basis in order to

53

operate the club through the end of the ski season, *see id.* at *6. Overruling an objection on lack of adequate protection, the bankruptcy court concluded that without the DIP financing the club would "go dark" to the detriment of all creditors, including the objecting creditor. *Id.* at *9. But with the DIP financing, the debtors would generate "substantially more" in sale proceeds as a going concern than they would if they had sold the club in a "moth ball" sale, *i.e.*, as a shut-down project. *Id.* at *10–11. In this regard *In re Yellowstone Mountain Club* resembles these appeals (although the Debtors here were not operating as a going concern).

But unlike these appeals, the debtors there also pledged the sale proceeds of "the premier estate property in all of Europe," *id.* at *4, a property worth $60 million — four times the amount of the priming lien — and that was unencumbered by the objecting creditor to repay the DIP financing, *see id.* at *11. Additionally, the secured creditor could in addition demand payment on promissory notes worth about $275 million. *See id.* "Collection of a mere $20 million on the Promissory Notes would more than offset . . . [the] DIP financing, which DIP financing is maintaining the value of the Debtors' assets . . . ." *Id.* So although the DIP financing was necessary to preserve or maximize the value of the debtors' assets, the sale proceeds from the European estate and the promissory notes (more than) offset the decrease in the value of the creditor's interest in the debtors' assets caused by the priming lien. Here, in contrast, there is no evidence in the record demonstrating what — if anything — the Debtors could offer the Statutory Lienholders for the decrease in the value of their interests in the assets caused by the priming lien.

For his part the Examiner cites numerous cases, but discusses two at length: *MBank Dallas, N.A. v. O'Connor* (*In re O'Connor*), 808 F.2d 1393 (10th Cir. 1987), and *In re Hubbard Power &*

*Light*, 202 B.R. 680 (Bankr. E.D.N.Y.). *In re O'Connor* concerns the decrease in value of collateral caused by the use of cash collateral, not by the grant of a priming lien, but the principle of adequate protection applies equally in both kinds of cases. In the case, the debtors sought to use cash collateral in order to drill three gas wells. 808 F.2d at 1395. As adequate protection for the objecting creditor, the debtors "offered replacement liens on the well proceeds and on other unencumbered regular monthly income." *Id.* That, the Tenth Circuit concluded, was sufficient.

> [T]he creditor had a proceeds lien in cash worth $721,600. The Debtors proposed to use the cash thereby reducing the *value* of the creditor's security interest by $721,600, but in exchange, the Debtors proposed to give the creditor a *new* proceeds lien in property presently worth *over five times that sum*.

*Id.* at 1398 (third emphasis added). In other words, the debtors offered the creditor a lien on property worth well in excess of the decrease in value of the creditor's interest caused by the debtors' use of the cash collateral. Here, the Debtors did not offer the Statutory Lienholders anything new, much less a replacement lien on later-acquired property.

Similarly, in *In re Hubbard Power & Light*, a debtor, that due to an injunction could not operate because of a hazard that needed to be removed from its property, sought $750,000 on a priming basis to clean up the hazard in order to operate as a going concern "worth several million dollars." 202 B.R. at 684. The court overruled a secured creditor's objection that its interest was not adequately protected. After concluding that the value of the creditor's lien was worth next to nothing because of the injunction, the court stated, "any improvement to the Debtor's real property by way of a clean-up sufficient to remove the injunction . . . will greatly improve the value of the collateral upon which [the creditor] has a lien. Therefore, since the clean-up . . . is a condition precedent to the loan, [the creditor] is adequately protected." *Id.* at 685.

The Court does not find the basis of the court's finding of adequate protection in *In re Hubbard Power & Light* entirely clear.  Nevertheless, the value of the debtor's assets would potentially be improved by several million dollars.  To the extent, therefore, that the creditor was entitled to adequate protection at all (the court found that the creditor's lien was worth "zero" or "at best" $275,000), the decrease of the value of the creditor's interest caused by the priming lien would be more than offset by the going-concern value of the debtor's assets.  *See id.* at 685.  Again, there was no contention here that the decrease in the value of the Statutory Lienholders' interests in the Debtors' assets caused by the priming lien would be offset in any way.  And although the Examiner testified that the DIP facility would "enhance[] the value of the assets" (Hr'g Tr. 189:21–23, Nov. 23, 2009), he did not testify that they would be "enhanced" by an amount greater than the decrease caused by the priming lien.[31]

---

[31] The other cases on which the Examiner relies fare no better.  In all but one, any increase in the value of the assets due to the proposed DIP financing offset any decrease caused by a priming lien or use of collateral.  *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1090 (4th Cir. 1986) ("[T]he district court's determination of adequate protection for the purpose of allowing the superpriority loan was supported by both *an equity cushion* and the well-reasoned financial analysis of the trustee . . . ." (emphasis added)); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 632 (Bankr. S.D.N.Y. 1992) ("[The creditor] will be adequately protected because the infusion of approximately $600,000.00 in improvements from the borrowed proceeds will enhance the value of the property secured by [the creditor's] mortgage *by at least the amount of the borrowed proceeds*." (emphasis added)); *In re Ledgemere Land Corp.*, 125 B.R. 58, 62–64 (Bankr. D. Mass. 1991) (similar).

Perhaps the best case in support of the finding of adequate protection is *In re Devlin*, 185 B.R. 376 (Bankr. M.D. Fla. 1995).  There, the debtor, who operated a "resort motel" encumbered by a mortgage securing a $2.3 million debt, sought to borrow $123,920 from his mother on a priming basis in order to replace the air-conditioning system.  According to the court, replacing the system was necessary to preserve the value of the motel and to maintain ongoing operations, and its replacement was "in the best interest of the Debtor and its estate." *Id.* at 378.  *In re Devlin* may be distinguished on the ground that changing the air conditioner was necessary to maintain ongoing operations (an inference may be drawn, although it is unclear from the case, that doing so would offset the loan).  Here, no ongoing operations were being maintained: the Debtors sought to prime the Statutory Lienholders' liens in order to "stabilize" the Project for a sale.  At any rate, whatever the merit of *In re Devlin* one additional fact of the case is notable: the only party entitled to

Case No. 09-23683-CIV-ALTONAGA

When formulating adequate protection in connection with post-petition financing on a priming basis, preserving or enhancing the value of collateral must be viewed side-by-side with the decrease in value of a creditor's interest in the property caused by the priming lien.  *See In re Swedeland Dev. Grp.*, 16 F.3d at 566 ("[C]ontinued construction based on projections and improvements to the property does not alone constitute adequate protection.  Those cases which have considered improvements to be adequate protection have done so only when the improvements were made *in conjunction with the debtor's providing additional collateral beyond contemplated improvements*." (emphasis added)); COLLIER, *supra*, ¶ 361.03[5][b], at 361-21.  Here, the Debtors and the bankruptcy court focused on preserving the value of the Project for the benefit of all creditors.  That goal was worthy and important, and the Court does not question it.  But the Debtors did not try to establish, and the bankruptcy court did not find, that the decrease in the value of the Statutory Lienholders' *interests therein* caused by the priming lien was compensated, replaced, or substituted in any way: to be blunt, the Statutory Lienholders were not adequately protected.  The proceedings below failed to account for what a priming lien does.  *See In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) ("Given the fact that super priority financing *displaces liens* on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected." (emphasis added)); COLLIER, *supra*, ¶ 364.05, at 364-21 ("The ability to prime an existing lien is extraordinary, and in addition to the requirement that the trustee be unable to otherwise obtain the credit, the trustee must provide adequate protection for *the interest* of the holder of the existing lien."

_____

adequate protection did not oppose the debtor's motion to prime its interests.  *See id.* at 377.

Case No. 09-23683-CIV-ALTONAGA

(emphasis added)).  Not accounting for the decrease caused by the priming lien was fundamentally at odds with the principle of adequate protection, which must "as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights."  *In re Swedeland Dev. Grp.*, 16 F.3d at 564 (internal quotation marks omitted).

* * *

Before the Court moves on, two additional issues on adequate protection must be addressed. The first is whether the bankruptcy court clearly erred in concluding that the leasehold of the Project had "zero value on a stand-alone basis," and, based thereon, concluding that the Statutory Lienholders, who held liens on the leasehold, were not entitled to adequate protection for the priming lien granted to Icahn Nevada in connection with the interim-retail-financing order.  Karawan, to be sure, testified that the leasehold had "no value" on an "as-is basis."  But he also testified that if the leasehold were sold with the resort debtors' assets — in other words, if the hole in the donut were sold with the donut — then there *would* be value in the leasehold.  It therefore did not follow that the Statutory Lienholders were not entitled to adequate protection on the leasehold.  The Statutory Lienholders held liens on both the resort *and* the retail debtors' assets.  If they had foreclosed on both and sold both as the Debtors sold both to Icahn Nevada (that was the reason why the Retail Debtors had filed for bankruptcy in the first place!) they would have realized value on the leasehold.  *See* BLACK'S, *supra*, at 1586 (defining "value" as "[t]he monetary worth or price of something; the amount of goods, services, or money that something will command in an exchange" (second definition)); *see also id.* at 1587 (defining "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction").  The

Statutory Lienholders were entitled to adequate protection for the value of their interests in the Retail Debtors' assets.  The bankruptcy court clearly erred in finding that they were not.

The second pertains to the examiner order.  As an initial matter, the Court wishes to make plain the only conclusion that may be made from the papers and the record: the Examiner discharged his duties competently and in accordance with his mandate.  Yet the Court cannot affirm the order because the bankruptcy court cited no authority for the proposition that an objection to compensating an examiner on a priming basis is "unimportant."  This is especially so where, as here, a bankruptcy court provides no adequate protection for the entity that is being primed.  Nor can the Court affirm the order on the Examiner's second ground, which was not the basis of the bankruptcy court's order, that his expenses "are compensable as a surcharge against the Project" under 11 U.S.C. § 506(c).  None of the cases he cites supports the proposition that an examiner may avail himself of section 506(c).  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (per curium) ("[T]he statute appears quite plain in specifying who may use § 506(c) — 'the trustee.'  It is true . . . that all this actually 'says' is that the trustee may seek recovery under the section, not that others may not.  The question thus becomes whether it is a proper inference that the trustee is the only party empowered to invoke the provision.  We have little difficulty answering yes." (alteration and footnote call number omitted)); *In re Smith Int'l Enters., Inc.*, 325 B.R. 450, 454 (Bankr. M.D. Fla. 2005) ("The rule following *Hartford* . . . is that Section 506(c) is a remedy exclusive to the trustee.").

**B.     Repayment of the Used Cash Collateral**

The Statutory Lienholders contend the bankruptcy court erred by authorizing the Debtors,

under the financing orders, to repay the cash collateral they had used to the Term Lenders.  This is largely because the bankruptcy court had previously erred in granting the Term Lenders priming liens for the use of the cash collateral under the third, fourth, and nonconsensual cash-collateral orders, as well as the first and second supplemental orders.[32]  According to the Statutory Lienholders, repaying the Term Lenders "ahead of [them] gives effect to the invalid and avoidable priming liens." (Br. Appellants 21).

The Statutory Lienholders' chief objection derives from the following "finding," which each disputed cash-collateral order contains in substantially the same form:

> Prepetition Debt and Adequate Protection Obligations Deemed to Be Postpetition Debt Secured by Senior Lien Under Section 364(d) of the Bankruptcy Code.  Under the Prior Cash Collateral Orders, the Prepetition Secured Parties were granted Adequate Protection Obligations, including Adequate Protection Liens and Superpriority Claims, as protection for the use of Cash Collateral thereunder. . . . Pursuant to the Third Interim Order and the Fourth Interim Order, the Cash Collateral authorized to be used thereunder was *deemed to have been repaid* to the Prepetition Secured Parties in satisfaction of payment Obligations under the Prepetition Loan Documents, and further *deemed to have been reborrowed* by the Debtors as postpetition debt, pursuant to section 364(d) of the Bankruptcy Code . . . .  Based on the record before the Court, the continued application of such provisions to the Cash Collateral utilized under this Order is likewise appropriate, necessary, and authorized by the Bankruptcy Code.

(Nonconsensual Cash-Collateral Order ¶ F (emphasis added); *see also, e.g.*, *supra* Part I.A. (quoting Third Cash-Collateral Order ¶ G)).  The Statutory Lienholders contend this finding was, at bottom,

---

[32]  It is also because, with regard to the first and second cash-collateral orders, the bankruptcy court erred in authorizing the DIP facility, which in turn granted priming liens to Icahn Nevada, which in turn was the basis for repaying the used cash collateral under the first and second cash-collateral orders.  That is because the bankruptcy court did not ensure that the Statutory Lienholders were adequately protected.  As counsel for the Statutory Lienholders put it, the Term Lenders refused to consent to the DIP facility because of paragraph 11(e), whereas the Statutory Lienholders refused to consent because of section 364(d).  The Statutory Lienholders contend it was error for the bankruptcy court to side with paragraph 11(e) of the cash-collateral orders rather than "what Congress told."  (Hr'g Tr. 223:18).

the product of legal sausage-making that allowed the Debtors to grant priming liens to the Term Lenders under section 364(d) to ease the Term Lenders' concerns about the Debtors' use of the cash collateral.  In other words, the Debtors would use (and thereby erode) the cash collateral, but would in exchange provide the Term Lenders with a corresponding first-priority lien in the Debtors' assets (which were subject, the Statutory Lienholders state, to their first-priority liens).  According to the Statutory Lienholders, the cash collateral the Debtors allegedly "repaid" and "reborrowed," which allowed the Debtors to take advantage of priming liens available under section 364(d), never actually occurred: rather, the Debtors were simply using cash collateral in which the Term Lenders held a first-priority interest.  And section 363, which expressly governs a debtor's use of cash collateral and speaks nothing of priming liens, ought equally to have governed the Debtors' use of the cash collateral here.  Section 364(d) was unavailable because it, "by its express terms, applies only to the granting of liens as security for *new, postpetition* credit authorized by the Court."  (Br. Appellants 25).

According to the Term Lenders, the grant of priming liens was authorized because the cash collateral on which the Term Lenders held an undisputed first-priority lien, constituted new, postpetition financing "in substance."  (Term Lenders' Opening Br. 9 [ECF No. 78]).  The orders, the Term Lenders argue, were consistent with case law and the Guidelines for Motions Seeking Authority To Use Cash Collateral and Motions Seeking Approval of Postpetition Financing of the U.S. Bankruptcy Court for the Southern District of Florida (the "Guidelines").[33]  (*See id.* 10–11).

---

[33]

http://www.flsb.uscourts.gov/web_folder/courts_guidelines/Guidelines_for_Motions_Seeking_Authority
_to_Use_Cash_Collateral_and_Motions_Seeking_Approval_of_Postpetition_Financing_(CG-7).pdf.

Case No. 09-23683-CIV-ALTONAGA

Furthermore,

> [t]he continued use by the Debtors of cash collateral without affording a priming lien to the Lenders would have provided Appellants with an enormous potential windfall. Had the Debtors been unable to use cash collateral as bridge financing to the DIP Facility and ultimately the sale of the property, the Debtors would have been required to seek post-petition financing from a third party at the outset.  Such third party would . . . have insisted on obtaining priming liens to secure that loan.  The grant of a priming lien to the Lenders was intended to maintain the status quo, by ensuring that any "new cash" obtained from the Lenders' cash collateral would be returned with the same first priority that it enjoyed prior to its use.  In the meantime, Appellants were put in no worse position than would have resulted from the grant of a priming lien to a third party lender.

(*Id.* 12).

In each disputed cash-collateral order, the bankruptcy court expressly granted the priming liens to the Term Lenders under section 364, which "authorizes Chapter 11 debtors to obtain secured credit and incur secured debt as part of their reorganization."  *In re Saybrook Mfg. Co.*, 963 F.2d at 1495.  The Court must therefore determine whether section 364 authorized the bankruptcy court to grant priming liens to the Term Lenders for the Debtors' use of the cash collateral.  Under the plain language of the statute, and as interpreted by the Eleventh Circuit, it did not.

Section 364(d)(1) provides in full:

> The court, after notice and a hearing, may authorize the *obtaining of credit* or the *incurring of debt* secured by a senior or equal lien on property of the estate that is subject to a lien only if —
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(emphasis added).

"By their express terms, sections 364(c) & (d) apply only to future — i.e., post-petition —

62

extensions of credit." *In re Saybrook Mfg. Co.*, 963 F.2d at 1495; *accord id.* ("'Section 364(d) speaks only of the granting of liens as security for *new credit* authorized by the Court.'" (quoting *In re Tenney Vill. Co.*, 104 B.R. 562, 570 (Bankr. D.N.H. 1989)). The reason for this is clear: "Section 364 provides certain incentives that a trustee or debtor in possession may offer, with court approval, to induce potential lenders to undertake the risks involved in providing post-petition financing to a bankruptcy estate." *Tully Constr. Co. v. Cannonsburg Env'l Assocs., Ltd.* (*In re Cannonsburg Env'l Assocs., Ltd.*), 72 F.3d 1260, 1267 (6th Cir. 1996) (citing *Transam. Commercial Fin. Corp. v. Citibank, N.A.* (*In re Sun Runner Marine, Inc.*), 945 F.2d 1089, 1092 (9th Cir. 1991)). Here, the Term Lenders did not provide future or postpetition extensions of credit; the Debtors, rather, used cash collateral on which the Term Lenders hold a first-priority lien. Nor is the purpose of section 364(d) present in this case. The Debtors were not trying to induce the Term Lenders to undertake risks inherent in providing post-petition financing to the estate; the Debtors, rather, were trying to induce the Term Lenders to consent to the Debtors' use of the cash collateral, maintain the "status quo," or both.

The Debtors, to be sure, were required to provide the Term Lenders with adequate protection for the use of that cash collateral. *See* 11 U.S.C. § 363(e); COLLIER, *supra*, ¶ 363.05[2], at 363-37. The reason for this requirement was starkly present here because the Debtors were using the cash collateral for the benefit of all potential creditors, and it was evident early on that if the Term Lenders did not prevail on the issue of priority, the chances of recouping the loss were slim. Nothing in the Bankruptcy Code, however, appears to authorize a bankruptcy court to prime a secured

creditor as a kind of adequate protection for the use of cash collateral.[34]  Yet that is precisely what the bankruptcy court authorized here.

The Court is unpersuaded by the Term Lenders' arguments to the contrary.  The case *Unsecured Creditors' Comm. v. Jones Truck Lines, Inc.* (*In re Jones Truck Lines, Inc.*), 156 B.R. 608 (W.D. Ark. 1992), did not address whether a debtor may grant a lender a priming lien under section 364(d) for the use of cash collateral on which the lender holds an interest.[35]  *In re Chrysler, LLC*, No. 09-50002 (AJG), 2009 WL 1357948 (Bankr. S.D.N.Y. May 4, 2009), which is an "interim cash collateral order" remarkably similar to the disputed cash-collateral orders in this case, indeed provided that "[t]he use of Cash Collateral shall be deemed an extension of credit pursuant to section 364 of the Bankruptcy Code by the First Priority Secured Parties," and provided further that "the First Priority Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code." *Id.* at *7.  This order supports the Term Lenders' position, but mainly because what was done in this case had been done before.  The court in *In re Chrysler* cited no authority in support of these rulings.  It is wholly unclear, moreover, whether any party objected to them.  These cases, in sum, provide thin authority for the legality of the disputed cash-collateral orders, especially when juxtaposed with the language and purpose of section 364(d).

Further, it is far from clear whether the disputed cash-collateral orders are authorized by the

---

[34]  Even the Debtors admit these priming liens functioned as "additional adequate protection."  (Br. Debtors 8).

[35]  *See* 156 B.R. at 612 ("The Committee did object below to giving the bank a superpriority claim of administration under 11 U.S.C. § 364(c), but in open court the Committee counsel stated 'We got rid of the 364 super lien objection', and that he was pursuing above all an objection to the carve-out instead.  That is to say, the Committee was no longer contesting this point." (alteration and citations omitted)).

bankruptcy court's Guidelines.  The Guidelines require all motions seeking authority to use cash collateral to state prominently any "[p]rovisions that deem prepetition secured debt to be postpetition debt or that use post-petition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b)."  Guidelines pt. II, ¶ (B)(5), at 2.  This provision discusses only "deeming" prepetition secured debt to be postpetition debt; it states nothing about whether doing so authorizes a court to grant priming liens reserved to postpetition lenders under section 364(d).  Even if it did, however, the Guidelines cannot "prime" the Bankruptcy Code or the Eleventh Circuit's interpretation thereof.

Last, it may be true, as the Term Lenders contend, that if the Debtors did not use the cash collateral on a priming basis, the Debtors would have had to obtain financing from another source on a priming basis anyway.  Section 363, which governs the use of cash collateral, and Section 364, which governs the obtaining of credit, are written clearly.  Under the latter, priming liens are made available explicitly; under the former, they are not.  Without clear authority provided either by the statutes or case law, the Court is hesitant to create what would appear to be an exception to the Bankruptcy Code.  But even if the Court were to do so, what is particularly troublesome here is that the Debtors provided the Statutory Lienholders with no adequate protection to preserve the value of their interests — the Debtors provided the Term Lenders with adequate protection in the form of priming liens, but provided nothing to the Statutory Lienholders, whose liens were thereby displaced.

## V.  CONCLUSION

The Court recognizes the difficulties the parties faced.  Fontainebleau Las Vegas was not developing into the intended Fontainebleau Las Vegas at all: a "Tier A" casino-hotel resort that

would have been worth more than the steel, concrete, and air-space rights that made up "the Project" it actually was. It was clear early in these proceedings that it might never be. So the parties focused on a sale. Doing so proved difficult, however, due largely to the "pitch fork battle" over "Who's on first?" in which the Statutory Lienholders and the Term Lenders were (and continue to be) engaged. (*See* Hr'g Tr. 42:12–13, Mar. 11, 2010).

The Debtors ultimately sold the Project to Icahn Nevada. They did so, in part, through the bankruptcy court's disputed cash-collateral orders, the examiner order, and the financing orders. The bankruptcy court erred in entering these orders over the Statutory Lienholders' objections. First, the bankruptcy court erred by authorizing the Debtors to use the Term Lenders' cash collateral on a priming basis under section 364(d), and further erred by failing to ensure that the Statutory Lienholders' interests were adequately protected. Second, the bankruptcy court erred by authorizing the Examiner to be paid on a priming basis, again without ensuring that the Statutory Lienholders' interests were adequately protected. Last, the bankruptcy court erred by authorizing the Debtors to obtain postpetition financing from Icahn Nevada under section 364(d) — again without ensuring that the Statutory Lienholders' interests were adequately protected.

Writing about the doctrine of equitable mootness, then Judge Alito discussed the ability courts have in fashioning effective relief:

> [E]ven if we find that [the doctrine of equitable mootness] is applicable, it does not necessarily dictate that we dismiss the appeal or affirm in its entirety a district court order of dismissal. Rather, we retain the ability to craft, or to instruct the district or bankruptcy courts to craft, a remedy that is suited to the particular circumstances of the case.

*In re Cont'l Airlines*, 91 F.3d at 571 (Alito, J., dissenting). In the Eleventh Circuit, as in most

Case No. 09-23683-CIV-ALTONAGA

circuits, a determination of equitable mootness does require dismissal.  But these appeals are not

moot, equitably or otherwise.  The second sentence of this quoted passage, therefore, applies fully

here.  Consistent therewith and the reasons herein, it is

> **ORDERED AND ADJUDGED** as follows:

1.    These appeals are **REMANDED** to the bankruptcy court.  The bankruptcy court must craft
a remedy consistent with this Order.  At bottom, the financing orders decreased the value of
the Statutory Lienholders' interests in the Project by the amount of the priming lien granted
to Icahn Nevada.  Under those orders, funds were disbursed to the Term Lenders, the
Examiner, and other professionals.  Although the bankruptcy court cannot recover all the
funds, it may and must recover the funds distributed to the Term Lenders, the Examiner, and
the professionals pending a determination of the issue of priority — not to exceed any
amount the Statutory Lienholders have requested.  Any compensation to which the Examiner
and other professionals may be entitled must be made in accordance with law.

2.    The Term Lenders' Motion to Dismiss **[ECF No. 79]** is **DENIED**.

3.    Nothing herein affects Icahn Nevada, who is "carved out."

4.    This matter is **CLOSED**.

5.    All pending motions are **DENIED AS MOOT**.

> **DONE AND ORDERED** in Chambers at Miami, Florida, this 14th day of July, 2010.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

67